**CAPITAL NETWORK SYSTEM, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, et al., Respondents.**

No. 92–1640.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 18, 1994.

Decided July 15, 1994.

Rehearing and Suggestion for Rehearing In Banc Denied Sept. 28, 1994.

202

Randolph J. May, Washington, DC, argued the cause for petitioner. With him on the briefs was Richard S. Whitt. David A. Gross, Washington, DC, entered an appearance.

Carl D. Lawson, Counsel, F.C.C., Washington, DC, argued the cause for respondents. With him on the brief were Renee Licht, Acting Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., John E. Ingle, Deputy Associate Gen. Counsel, Anne K. Bingaman, Asst. Atty. Gen., Catherine G. O'Sullivan and Nancy C. Garrison, Attys., U.S. Dept. of Justice, Washington, DC. Laurel R. Bergold, Counsel, F.C.C., Washington, DC, entered an appearance.

Peter Douglas Keisler, Washington, DC, entered an appearance for intervenor.

Before: MIKVA, Chief Judge, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

Dissenting opinion filed by Circuit Judge WILLIAMS.

MIKVA, Chief Judge:

Capital Network System, Inc. ("Capital") filed an Interstate Common Carrier Transfer Service tariff with the Federal Communications Commission ("FCC" or "Commission") to recover the costs of rerouting long-distance calls that parties charged to "proprietary" calling cards. The Commission rejected Capital's proposed tariff without a hearing, deeming the tariff patently unreasonable in violation of the Communications Act and unclear and ambiguous in violation of Commission rules. We deny the petition for review.

## I. Background

Capital Network System, Inc. is a small, interexchange communications carrier ("carrier") providing long-distance telecommunications services to businesses and payphone providers. Typically, a business or payphone provider contracts with a single carrier to transmit its long-distance calls, so that when such a call is placed, it is routed automatically to the presubscribed carrier. If a caller wants to charge a long-distance call to a carrier other than the one to which a line is presubscribed, she must either "dial around" the presubscribed carrier by dialing the desired carrier's access code, or dial "0 +" to request assistance from the presubscribed carrier's operators. Upon receiving a "0 +" call, the presubscribed carrier will validate the calling party's billing instructions (typically, a calling card number) and then route the call to the called party. The billing validation process screens out calls that parties may try to charge to fraudulent or otherwise invalid numbers. The presubscribed carrier bears the risk of non-collection when placing an unvalidated call.

To validate a party's calling card number, a presubscribed carrier must access a data-base of valid card numbers maintained by the entity that issued the card. Most major carriers, such as AT & T, MCI, and Sprint, deny this access to smaller carriers; as such, their cards are termed "proprietary." All of the major carriers, except AT & T, have successfully instructed their cardholders to "dial around" a presubscribed carrier. But, as of the time Capital filed this petition, AT & T had not effectively done so. Consequently, Capital received a disproportionate number of "0 +" calls from cardholders using AT & T's Card Issuer Identification formatted ("CIID") cards. (In the first phase of a separate rulemaking proceeding that overlapped with the tariff filings at issue in this case, the Commission directed AT & T to "provide clear and accurate access code dialing instructions on every proprietary card issued," and to "educate its cardholders" about when to use 0 + dialing. *In the Matter of Billed Party Preference for 0 + InterLATA Calls,* 7 F.C.C.R. 7714 (November 6, 1992). We do not know the upshot of these directives.)

Because Capital's operators cannot access AT & T's validation database, Capital reroutes "0 +" calls billed to CIID cards to the originating local exchange carrier for connection to AT & T. Capital estimates that processing CIID calls in this manner cost the company an average of $100,000 to $200,000 per month in 1992. Capital contends that, as a practical matter, it cannot refuse to transfer CIID calls without risking callers' ire and the consequent erosion of its customer base. We accept this contention as true for purposes of this case. Furthermore, FCC rules prohibit carriers from passing transfer costs on to CIID cardholders. *See* 47 C.F.R. § 64.705(b). Therefore, AT & T's refusal to provide smaller carriers access to its validation database saddles those carriers with substantial costs.

On June 13, 1991, Capital filed the tariff at issue in this case to recoup the costs associated with its transfer of CIID calls back to the originating local exchange carrier for connection with AT & T. Under its proposed "Interstate Common Carrier Transfer Service," Capital would charge any interexchange carrier that denied Capital access to its data-

base a $1.50 per call service fee whenever Capital transfers to the local exchange carrier a call billed to a proprietary calling card. Neither AT & T nor any member of the public filed petitions or protests against Capital's proposed tariff.

The Commission's Common Carrier Bureau rejected Capital's proposed tariff as "patently unlawful" in violation of § 201 of the Communications Act and "unclear and ambiguous" in violation of FCC rules. *In the Matter of Capital Network Systems, Inc.*, 6 F.C.C.R. 5609 (1991). On appeal, the FCC affirmed the Common Carrier Bureau's decision and rejected Capital's application for review. *In the Matter of Capital Network Systems, Inc.*, 7 F.C.C.R. 8092 (1992). While acknowledging that "tariff filings by non-dominant carriers [such as Capital] enjoy a presumption of lawfulness," the Commission concluded that, under section 201(b) of the Communications Act, it was "patently an unreasonable practice for Capital to automatically charge an entity for a service it did not order and may not have received." *Id.* at 8092–93. The Commission also affirmed the Bureau's finding that the tariff was "unclear and ambiguous" in violation of 47 C.F.R. §§ 61.2, 61.54. *Id.* Capital seeks review of these determinations.

## II. Discussion

Capital challenges the Commission's rejection of its proposed Interstate Common Carrier Transfer Service on three grounds. First, it contends that the FCC exceeded the scope of its authority under the Communications Act by rejecting the proposed tariff without a hearing. Second, Capital argues that the FCC failed to apply the presumption of lawfulness that Commission rules accord non-dominant carrier-initiated tariffs. Third, Capital argues that the Commission's actions were arbitrary and capricious because they were "wholly unprecedented" and inconsistent with the treatment accorded dominant carrier tariffs when challenged on vagueness grounds.

### A. Communications Act

#### Power to Reject

■ Congress entrusted administration of the Communications Act, 47 U.S.C. 201 *et*

*seq.*, to the FCC. Section 201(b) of the Act mandates that any interstate communications charge, practice, classification, or regulation must be "just and reasonable" and declares unlawful any that are "unjust or unreasonable." 47 U.S.C. § 201(b). Because "just," "unjust," "reasonable," and "unreasonable" are ambiguous statutory terms, this court owes substantial deference to the interpretation the Commission accords them. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

■ Although the Communications Act does not expressly authorize the Commission to reject tariff filings summarily, courts have inferred that the Commission has the general power to do so under § 201 of the Act. *Municipal Light Boards v. FPC*, 450 F.2d 1341, 1346 (D.C.Cir.1971); *see also American Broadcasting Cos. v. FCC*, 663 F.2d 133, 138 (D.C.Cir.1980). The Commission's authority to reject filings extends to those that are "patent nullit[ies] as a matter of substantive law" as well as those with technical or procedural flaws. *Municipal Light Boards*, 450 F.2d at 1346.

■ Because the Commission equates tariff filings with contract offers, contract law provides the analytical framework by which the Commission assesses a tariff's "justness" and "reasonableness." Capital does not dispute that, under general principles of contract and tariff law, a tariff implies the formation of a carrier-customer relationship. Moreover, Capital concedes that it sought to charge interexchange carriers for transfer services that they did not affirmatively order. The Commission claims that its then-prevailing definition of "customer"—a party that affirmatively requests and receives a tariffed service—renders Capital's proposed transfer tariff patently null. *In the Matter of Capital Network Systems, Inc.*, 7 F.C.C.R. 8092, 8093 (1992); *see also In the Matter of AT & T's Private Payphone Commission Plan*, 7 F.C.C.R. 7135 (1992) (recognizing the "caller" to be the "customer" of "0 +" service); *cf. In the Matter of the Bell Atlantic Telephone Companies*, 4 F.C.C.R. 455 (1988) (approving

transfer service tariff when interexchange carriers affirmatively subscribe to the transfer service).

Capital argues that its proposed tariff contains the requisite carrier-customer relationship upon which "just and reasonable" tariffs are predicated. According to Capital, AT & T "constructively ordered" Capital's transfer service by denying Capital and other small carriers access to its validation database. However, Capital cites no case decided before the FCC rejected the proposed transfer tariff in which the Commission construed "customer" to encompass parties beyond those who affirmatively requested services from a carrier. We accept the Commission's representation of its then-prevailing interpretation of "customer" and find that under that standard, Capital's proposed tariff is patently null.

The Commission's subsequent reinterpretation of "customer" to include parties that "constructively order" a carrier's services in no way alters our analysis. *See In the Matter of United Artists Payphone Corp.*, 8 F.C.C.R. 5562 (1993). In *United Artists,* the Commission embraced "constructive ordering" in the context of fraudulently placed calls—completed calls for which carriers bear the costs despite having validated the calling party's billing instructions. The Commission's reasoning in *United Artists* neither excuses carriers from validating the calling party's billing instructions nor authorizes them to recoup costs for calls that they failed to complete. That is precisely what Capital's proposed transfer tariff seeks to accomplish.

 Moreover, agencies "must be given ample latitude to 'adapt their rules and policies to the demands of changing circumstances.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting *Permian Basin Area Rate Case,* 390 U.S. 747, 784, 88 S.Ct. 1344, 1368, 20 L.Ed.2d 312 (1968)). We recognize that "[i]n some sense ... review of an agency's construction of an ambiguous statute is review of the agency's policy judgment." *Health Insurance Ass'n of America, Inc. v. Shalala,* 23 F.3d 412, 416 (D.C.Cir.1994). Capital does not argue that the Commission

made an unreasonable policy choice when it restricted "customers" to those parties that affirmatively ordered services from a carrier. Rather, Capital claims that the Commission's subsequent policy choice—construing "customer" to encompass parties that "constructively order" services—renders unreasonable the Commission's prior policy judgment. Because this argument collapses into a retroactivity claim, we find it untenable. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).

The Commission also rejected Capital's proposed tariff because the Company sought to charge AT & T for services that the latter would not necessarily receive. Although Capital labels its service as a "transfer" service, Capital cannot actually transfer calls directly to AT & T; no direct connection exists between the two facilities. As such, when a caller on a Capital presubscribed line wants to use her proprietary AT & T calling card, Capital can only transfer the call back to the originating local exchange carrier who will then presumably reroute the call to AT & T. Thus, nothing guarantees that a call "transferred" by Capital will ever reach AT & T; the caller might get frustrated and give up or the local exchange carrier might complete the call on its own facilities. Yet, Capital's proposed tariff provides that "an End User telephone call is deemed transferred when [Capital] activates the switch to transfer the call." Capital Network Systems, Inc., Tariff F.C.C. No. 2, Transmittal No. 1, proposed section 3.1, filed June 13, 1991. The Commission concluded that imposing charges for uncompleted transfers is *per se* unreasonable and warrants rejection of the tariff. *In the Matter of Capital Network Systems, Inc.,* 7 F.C.C.R. 8092, 8093 (1992).

Capital agrees that AT & T should not be charged for transfers that it never receives. Although petitioner's brief indicates that Capital will maintain computer tapes of the calls it transfers to AT & T so that the latter can verify assessed transfer costs, the tariff application failed to mention this. Capital Network Systems, Inc., Tariff F.C.C. No. 2, Transmittal No. 1, filed June 13, 1991. Moreover, the Commission rightly notes that

placing the verification burden on the "customer" is an "undue burden."

### B. Presumption of Lawfulness

■ By its plain language, section 1.773(a)(1)(ii) of the Commission's rules specifies the criteria by which the FCC determines whether to grant a petition to suspend a tariff filed by a non-dominant carrier. *See* 47 C.F.R. § 1.773(a)(1)(ii). In such proceedings, "tariff filings by nondominant carriers will be considered prima facie lawful" by the Commission. 47 C.F.R. § 1.773(a)(1)(ii). Presumably, the Commission also applies this presumption of lawfulness when considering whether to reject a tariff filing—hence the requirement that the tariff be patently unlawful. Capital contends that, because the FCC failed to accord Capital's proposed transfer tariff the presumption of lawfulness to which it was entitled under the Commission's rules, the Commission impermissibly rejected the tariff. We disagree.

■ Reviewing courts accord even greater deference to agency interpretations of agency rules than they do to agency interpretations of ambiguous statutory terms. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). "[I]n construing administrative regulations, 'the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (internal quotation omitted). The FCC claims that, throughout the Competitive Carrier proceedings (in which it adopted rule 1.773(a)), it emphasized that the substantive standards of sections 201 and 202 of the Communications Act continued to apply to non-dominant carriers. *See* Second Report and Order, 91 FCC2d 59, 70–71 (1982). The presumption of lawfulness that the FCC decided to accord nondominant carrier filings in no way excused such filings from the substantive requirements of the Communications Act. Accordingly, the FCC contends that rejecting a tariff that patently violates the requirement that tariffs be just and reasonable is entirely consistent with both the letter and spirit of its Competitive Carrier Report. Because the Commission's interpretation of the scope and meaning of the presumption of lawfulness articulated in section 1.773(a)(1)(ii) is neither "plainly erroneous" nor internally "inconsistent," we reject Capital's claim.

### C. Arbitrary and Capricious

■ Capital argues that the FCC's rejection of its proposed tariff marked an unexplained reversal of established agency policy in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). According to Capital, never before had the FCC rejected a non-dominant carrier-initiated tariff filing. Moreover, Capital claims that the FCC treated its uncontested tariff filing more harshly than it typically treats dominant carriers' contested tariffs filings. The FCC disavows any change or discrepancy in Commission policy or practice. Because Capital has cited no precedent in which the Commission knowingly accepted any tariff of any carrier that attempted to impose charges for services a customer had not affirmatively requested and may never have received, we do not deem the FCC's rejection of Capital's proposed tariff to be arbitrary and capricious.

### III. Conclusion

We are not unmindful that AT & T's failure to instruct its proprietary calling card users effectively imposed financial hardships on Capital. Capital knew that it could avail itself of the Communication Act's complaint procedures, 47 U.S.C. §§ 206–208, to recover any damages it incurred as a consequence of AT & T's allegedly unreasonable business practices. Instead, Capital chose to file the proposed tariff at issue in this case. Because Capital's Interstate Common Carrier Transfer Service proposed to charge entities issuing proprietary calling cards for services that they did not affirmatively order and would not necessarily receive, the FCC properly rejected Capital's proposed tariff as patently unlawful under the Communications Act. The petition for review is

*Denied.*

STEPHEN F. WILLIAMS, Circuit Judge, dissenting:

When a carrier files a tariff, the Federal Communications Commission has a range of options, from outright rejection at one extreme, through suspending the tariff and setting it for hearing, to outright acceptance. Under the precedents of the Commission and this circuit, the Commission may choose the extreme of outright rejection only where the filed tariff is for some reason a "patent nullity". Here the court finds that criterion satisfied for no better reason, so far as I can see, than that the tariff depended upon a premise that the Commission had never before affirmatively accepted. No matter that the premise was a perfectly sensible one—so sensible, in fact, that the Commission explicitly embraced it not long after the rejection here.

Capital Network System, Inc. is an independent provider of long-distance telecommunications services to businesses and payphone providers. AT & T, by failing to give its cardholders adequate instructions about how to dial around such firms, placed Capital in a bind. First, Capital could complete the call itself; being unable to verify the card number, however, because AT & T simultaneously refused Capital access to its proprietary database, it would be denied reimbursement if the caller had used a fraudulent billing number. (Reimbursement for calls by proper AT & T cardholders is evidently not a problem.) Alternatively, Capital could refuse the call altogether. But as the court's opinion makes clear, Capital was in no position to do so. AT & T customers would complain of inferior service to the payphone proprietors, such as hotels, who in the interests of preserving their customers' goodwill would respond by dropping Capital. The Commission appears not to challenge this reality. *In the Matter of Billed Party Preference for 0 + InterLATA Calls,* 7 FCCRcd 7714, 7716 ¶ 5 (1992) (noting independents' claim that customers become angry when unable to complete calls). Finally, Capital could—and did—transfer the calls to the local exchange carrier for transmission via AT & T, thereby incurring uncompensated costs of between $100,000 and $200,000 a month. The tariff in dispute seeks to charge for these transfer services.

We have held that outright rejection of a tariff filing is suitable either for extreme defects of form, *Municipal Light Boards v. FPC,* 450 F.2d 1341, 1346 (D.C.Cir.1971) ("a technique for calling on the filing party to put its papers in proper form or order"), or where the filing was "so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold rather than opening a futile docket", *id.* The Commission recognizes that its authority "to reject a carrier's tariff is very limited." *American Telephone and Telegraph Co.,* 67 FCC2d 1134, 1157 (1978). In what it described as "a comprehensive interpretation of [its] rejection powers", *id.* at 1158, the Commission said: "[W]e have accepted and will continue to accept tariffs which are reasonably clear on their face and which contain the minimum in supporting documentation required by our rules, *leaving any more detailed issues of lawfulness to the hearing process where appropriate".* *Id.* (emphasis added). As the paradigm for rejection it offered the case "where the tariffs filed by a carrier are in direct response to a prior Commission decision after hearing, which established specific guidelines and tariff justification requirements for the instant filing" and the filing fails to comply with this prior Commission decision. *Id.* at 1158–59; see also *RCA American Communications, Inc.,* 89 FCC2d 1070, 1076 & n. 11 (1982) (declining to reject tariff even though it "present[ed] substantial questions of lawfulness", *id.* at 1077).

When Capital filed a tariff to collect from AT & T for the unwanted calls, the Commission rejected the filing on the ground that it was "patently an unreasonable practice for Capital to automatically charge an entity [AT & T] for a service it [1] did not order and [2] may not have received." *In the Matter of Capital Network Systems, Inc.,* 7 FCCRcd 8092, 8093 ¶ 9 (1992) (brackets added). I address these two complaints in turn.

For the idea that an entity may be charged only if it has "order[ed]" a service, the Commission pointed only to *In the Matter of The*

*Bell Atlantic Telephone Companies,* 4 FCCRcd 455 (1988). But that decision laid down no such marker. True, the filing accepted there imposed charges on parties who ordered service; I suppose tariffs normally do. But the case simply does not address the issue of whether a firm may charge a competitor that has manipulated matters so as to assure that the would-be charging firm must carry the call.

The court tries to assist the Commission by suggesting that its supposed principle was set forth in *In the Matter of AT & T's Private Payphone Commission Plan,* 7 FCCRcd 7135 (1992). Not so. That decision's only discussion of "customers" and "subscribers" is for purposes of analyzing the prohibition against rebates. See *id.* at 7135–36 ¶ 8. Even in that context, the decision does not say that customers must be subscribers (though it does say that subscribers need not be customers).

In sustaining the Commission, the majority is therefore reduced to insisting that there was no pre-existing case by the Commission construing " 'customer' to encompass parties beyond those who affirmatively requested services from a carrier." Maj.Op. at 205. True enough, but it surely cannot be the case that *every* filing without an affirmative precedent is *ipso facto* "patently unreasonable". If the Commission were to proceed on any such theory—which, not surprisingly, it has not endorsed—it would rob itself of the flexibility needed to deal with novel circumstances.

Looking at the matter in terms of principle, the question would seem to be whether one can become a customer by acts as well as by words. The next time that issue was presented to the Commission, it answered in the affirmative. In *United Artists Payphone Corp.,* 8 FCCRcd 5563 (1993), the Commission held that AT & T could collect from a payphone lessee that had never ordered service. The lessee, it said, could be deemed to have "constructively ordered" such service by operating payphones in a manner that allowed third parties to make fraudulent calls using AT & T's facilities. *Id.* at 5565, 5566–67 ¶¶ 8, 13. Yet just a year before the Commission evidently regarded it as not

merely unreasonable but "patently" unreasonable for Capital to try to charge AT & T when its instructions to its cardholders, coupled with its preservation of its proprietary database, effectively forced Capital to handle its calls.

Of course the existence of a *later* contrary decision does not in itself render the Commission's *Capital* decision unreasoned; it is the later shift that the agency must explain if that decision is challenged. See, e.g., *CHM Broadcasting Limited Partnership v. FCC,* Slip Op. at 11 (June 14, 1994), citing *Amor Family Broadcasting Group v. FCC,* 918 F.2d 960, 962 (D.C.Cir.1990). But the standard is one of patent unreasonableness. By invoking *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the court suggests that no more is involved than the Commission's giving the statute one reasonable reading today, another reasonable reading tomorrow. If that were the issue, affirmance would surely be in order. But here the established standard of *patent* unreasonableness requires more of the Commission. So long as Capital's position was not beyond the pale of admissibility, the Commission was bound to set the matter for hearing. Common sense, and the *United Artists* decision, suggest instead that Capital's premise was well within the pale.

The majority oddly invokes *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), holding that *rules* may not normally be applied retroactively. Maj.Op. at 205. But *United Artists* is not a rule but an adjudication, and, more pertinently, Capital is not *seeking* retroactive application of the *United Artists* holding. It invokes it only as evidence of what is and is not patently unreasonable.

The Commission also said that the tariff sought to assess charges for services that might never be received—because the local exchange carrier to which Capital handed off the call might not effect the transfer. But even though the tariff does assess charges at a point before it is possible to know whether the call has been successfully completed, see Tariff § 3.1 (call "is deemed transferred when CNSI activates the switch to transfer

the call"), the Commission has in the past handled such difficulties by setting the matter for a hearing. *In the Matter of American Satellite Corporation Revisions to Tariff F.C.C. No. 1,* 67 FCC2d 1487, 1490 (1978). In that case, it denied a petition for rejection, but instituted an investigation of a tariff where the absence of a termination clause might cause the customer to "be obligated to pay charges for service he did not receive or could not use", *id.* at 1492 ¶ 17. Here, Capital offered a solution in its Application for Expedited Review, a solution that the Commission in its brief says would impose undue monitoring burdens on AT & T, see Commission Br. at 18, although it failed to offer that critique before. Of course traditional phone customers routinely incur monitoring costs for billed service to ensure they are not charged for uncompleted outgoing calls. In any event, as in *American Satellite,* the issue could have been explored at a hearing.

\* \* \*

Because I reject those of the Commission's rationales that the majority embraces, I must proceed to the Commission's alternative basis for rejecting the tariff—that it violated §§ 61.2 and 61.54(j) of the Commission's rules requiring clear statements of the conditions governing the tariff. See 47 CFR §§ 61.2 & 61.54(j). Once the Commission reasonably finds a tariff in violation of its clear statement rules, it has authority to reject the tariff outright. See, e.g. *In the Matter of AT & T Communications Tariff F.C.C. No. 12,* 7 FCCRcd 5604, (CCB 1992); *In the Matter of US West Communications, Inc. Tariff F.C.C. No. 1,* 7 FCCRcd 2245 (CCB 1992); *In the Matter of Centel Telephone Companies Revisions to Tariff F.C.C. No. 1,* 6 FCCRcd 1001 (CCB 1991). The inquiry then becomes whether the Commission's action was reasonable or arbitrary.

The Commission found the tariff ambiguous because it "did not clearly describe when a party would be charged for a call transfer". 7 FCCRcd at 8093. The Commission opinion never clearly explained exactly what it found to be ambiguous. It used as an example § 2.2 of the tariff, "Limitations on service", containing a passage that "reserve[d] the right to refuse to *process* Credit Card or Calling Card billed calls when authorization for use of the card cannot be validated". Tariff § 2.2(d). The Commission apparently believed the provision meant that Capital retained discretion to transfer some calls but not others to the LEC. Capital persuasively explains that "refusal to process" does not refer to a refusal to transfer, but only a refusal to complete calls on its own system. This reading seems the only sensible one, given that the discretion to refuse hinges on the inability to validate cards. The only time this inability matters to Capital is when it completes the call itself, not when it transfers the call. After all, Capital incurs the exact same costs in transferring calls by valid AT & T customers as by invalid ones;[1] it is only when Capital completes the call itself that Capital's inability to validate the caller's card exposes it to financial risk, and hence might create an incentive for it to refuse. The Tariff confirms that it is precisely *inability to validate* that triggers Capital's preference for transferring the call over completing it. See § 3.1 (if the user "insists on using a non-joint use calling card and not a calling card or other payment mechanism that can be validated and billed by CNSI, CNSI will transfer the call"). Since the natural reading of § 2.2(d) makes sense only if one understands "process[ing]" a call to mean "completing" it, the provision creates no ambiguity as' to when a party will be charged for transfer service, the subject of the tariff. But to the extent that the Commission used this as merely an example of

---

1. Capital would be paid under the tariff for transferring calls by invalid as well as valid customers, as the call is "deemed transferred" at the time the switch is activated. Thus, if Capital transferred a call that the LEC operator, acting jointly with AT & T, then refused to complete because the billing number was invalid, the Tariff would hold AT & T responsible for the transfer costs. I do not understand this scenario to drive

the concern stated in the Commission's brief about instances where the transfers "did not in fact result in the routing of credit card calls to AT & T", Commission Br. at 18, evidently referring to cases of end user frustration or a decision by the LEC to handle the call itself, *id.*; see also *Capital Network Systems,* 7 FCCRcd at 8093 n. 10.

several ambiguities, there may be a basis for its adhering to its original conclusion. Accordingly, I would remand to the Commission for it to consider whether there are other ambiguities justifying rejection of the filing. Cf. *Pittsburgh Press Co. v. NLRB,* 977 F.2d 652, 662 (D.C.Cir.1992) ("we cannot defer to what we imagine the agency had in mind").