Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 17, 2006　　　　　　Decided May 26, 2006

No. 05-1171

AT&T CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

BELLSOUTH CORPORATION, ET AL.,
INTERVENORS

———

On Petition for Review of an Order of the
Federal Communications Commission

———

*David W. Carpenter* argued the cause for petitioner. With him on the briefs were *David L. Lawson*, *James P. Young*, *Christopher T. Shenk*, and *Judy Sello*.

*Joel Marcus*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the

brief were *Thomas O. Barnett*, Acting Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *Samuel L. Feder*, General Counsel, Federal Communications Commission, *Richard K. Welch*, Associate General Counsel, and *John E. Ingle*, Deputy Associate General Counsel. *Laurel R. Bergold*, Counsel, entered an appearance.

*Scott H. Angstreich* argued the cause for intervenors. With him on the brief were *Michael K. Kellogg*, *Mark L. Evans*, *Sean A. Lev*, *Michael E. Glover*, *Edward H. Shakin*, and *Bennett L. Ross*.

Before: SENTELLE, ROGERS and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This case involves the proper ratemaking treatment of "OPEBs," post-retirement benefits other than pensions, including health and life insurance for retirees, following a change in the method of accounting for them. AT&T Corporation petitions for review of an order of the Federal Communications Commission allowing Verizon exogenous treatment of OPEB costs by treating those costs as beyond Verizon's control even though Verizon implemented the accounting change before the compliance deadline, and allowing local exchange carriers ("LECs"), like intervenors Verizon and Bellsouth, to use their 1996 tariffs to rectify the consequences of an erroneous staff order that OPEB liabilities be deducted from their rate bases. Because the Commission's interpretation of its control test is consistent with precedent and because the Commission's approval of the 1996 tariffs placed the LECs in the position they would have been in had the staff not erred, we conclude that AT&T has failed to show that the Commission's rulings were arbitrary and capricious. Accordingly, we deny the

petition.

**I.**

Before 1990, the Commission set interstate access charges under a rate-of-return regime. LECs reported their costs to establish a rate base and the Commission set prices that allowed LECs to earn a formulated rate of return on their investor-supplied capital. *See Nat'l Rural Telecom. Ass'n v. FCC*, 988 F.2d 174, 177-78 (D.C. Cir. 1993). In 1990, the Commission adopted a price cap regime. *See* Second Report and Order, *Policy and Rules Concerning Rates for Dominant Carriers*, 5 F.C.C.R. 6786 (1990) ("*1990 Price Cap Order*"). Carriers' services are grouped into various "baskets" for which a maximum price, the price cap index ("PCI"), is determined. From the initial price cap, rates are adjusted annually based on inflation and expected productivity advances. Unlike the rate-of-return system, costs do not generally affect the prices LECs may charge. Thus, if carriers reduce costs, they earn greater profits than the set rate of return under the former system. *See Bell Atlantic Tel. Cos. v. FCC*, 79 F.3d 1195, 1198 (D.C. Cir. 1996).

Two exceptions by which costs affect the PCI are relevant to this appeal. First, the "exogenous costs" rule allows carriers to adjust price caps to account for "costs that are triggered by administrative, legislative or judicial action beyond the control of the carriers." *1990 Price Cap Order*, 5 F.C.C.R. at 6807. Changes in generally accepted accounting principles ("GAAP") ordered by the Financial Accounting Standards Board ("FASB") can be treated exogenously if the Commission determines the changes are "compatible with [its] regulatory accounting needs." *Id*. Second, the sharing rules (repealed in 1997, *see Price Cap Performance Review*, 12 F.C.C.R. 16,642, 16,699-703 (1997)) require a carrier whose rate of return on its rate base is

abnormally high to share a portion of the excess with ratepayers, like AT&T, by reducing its PCI for the following year, a cost-based check harkening back to the rate-of-return regime. *See Bell Atlantic*, 79 F.3d at 1199.

In December 1990, the FASB adopted "SFAS-106," which requires carriers to account for OPEB obligations in the year in which they accrue rather than when they are paid. *See* FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 106, EMPLOYERS' ACCOUNTING FOR POSTRETIREMENT BENEFITS OTHER THAN PENSIONS (Dec. 1990). The transition from cash to accrual accounting applied to "ongoing amounts," i.e., the annual expense that a firm recognizes when its current employees earn retirement benefits to be paid in the future, and to the "transitional benefit obligation," i.e., the unfunded OPEBs owed at the time of adopting SFAS-106. In 1991, the Common Carrier Bureau required LECs to implement SFAS-106 because the change in GAAP was consistent with the Commission's regulatory objectives and stated that "[t]he effective date of SFAS-106 is for fiscal years beginning after December 15, 1992, although earlier implementation is encouraged by the FASB." Order, *Notification of Intent to Adopt SFAS No. 106*, 6 F.C.C.R. 7560 (1991).

The accounting change presented both rate base and exogenous treatment issues. The Bureau issued "RAO Letter 20" to LEC accounting officers, explaining that because OPEBs "are similar to pension expenses" they should be "given the same rate base treatment," such that "the interstate portion of unfunded accrued [OPEBs] should be deducted from the rate base." RAO Letter 20, *Re: Uniform Accounting for Postretirement Benefits Other than Pensions in Part 32*, 7 F.C.C.R. 2872 (1992) ("*RAO Letter 20*"). In 1996, the Commission rescinded the rate base portion of *RAO Letter 20* on

the ground that the Bureau had exceeded its authority by adding an exclusion not provided for in the Commission's rate base rules. *See* Order, *RAO Letter 20*, 11 F.C.C.R. 2957, 2961 (1996); 47 C.F.R. § 65.830 (1992). The following year, the Commission, upon determining that the Bureau had come to the right policy conclusion, amended its regulations to require that OPEBs be deducted from the rate base in future years. *See* Report and Order, *RAO Letter 20*, 12 F.C.C.R. 2321, 2327 (1997).

Through the exogenous cost feature of the ratemaking regime, several LECs sought in 1992 to increase their PCIs to reflect the new costs booked as a result of SFAS-106. The Commission rejected the rate increases on the ground that "LECs can exercise substantial control over the level and timing of OPEB expenses," such that the costs were not beyond the carriers' control in a way that would justify exogenous treatment under Commission rules. Order, *Treatment of LEC Tariffs Implementing SFAS*, 8 F.C.C.R. 1024, 1033 (1993). In *Southwestern Bell Telephone Co. v. FCC*, 28 F.3d 165 (D.C. Cir. 1994), the court concluded that the Commission's rejection was arbitrary and capricious because earlier orders showed that "the Commission meant for the 'control' test to be satisfied simply by the fact of exogenous imposition of the accounting rule, without concern for the underlying costs covered by the rule." *Id.* at 170. The court held that a "FASB change adopted by the Commission is not a change under control of the carrier, and, once mandated by the Commission, the change satisfies the control criterion [of the exogenous cost rule]." *Id.*

Thereafter, the LECs renewed their requests for exogenous treatment for OPEB adjustments in their 1994 tariffs. Verizon, which had implemented SFAS-106 in 1991 and 1992 — after it was approved by the Commission but before the deadline for compliance — sought exogenous PCI increases to recover

OPEB costs from those earlier years. *See* Order, *Bell Atlantic Tel. Cos. Tariff FCC No. 1,* 10 F.C.C.R. 1594, 1597-98 (1994). The Common Carrier Bureau suspended the Verizon tariffs for one day, imposed an accounting order, and began an investigation. *Id.* at 1598. While that investigation was pending, the Commission adopted a rule that prohibited exogenous treatment of OPEBs in the future because they do not have cash-flow or actual economic impact. *See* Order*, Price Cap Performance Review*, 10 F.C.C.R. 8961, 9089-95 (1995) ("*1995 Price Cap Order*").

After the Commission rescinded *RAO Letter 20*, the LECs restated their rate bases for the years during which the letter had wrongly instructed them to deduct OPEBs from their rate bases. Because they had incurred greater sharing obligations as a result of the exclusion of OPEBs during those years, the LECs sought in their 1996 tariffs a one-time increase in their PCIs as an "exogenous cost" to recoup the amount they lost as a result of complying with *RAO Letter 20. See* Order, *1996 Annual Access Tariff Filings*, 11 F.C.C.R. 7564, 7568 (1996). The Common Carrier Bureau suspended the tariffs for one day, imposed an accounting order, and began an investigation. *See id.* at 7605.

The Commission resolved these investigations in March 2005. *See* Order Terminating Investigation, *1993 Annual Access Tariff Filings Phase 1*, 20 F.C.C.R. 7672 (2005) ("*Order*"). It approved Verizon's request for exogenous treatment of OPEB costs incurred before January 1, 1993. The Commission stated that it would apply the price cap rules in effect when the tariffs were filed, *see id.* at 7680-81, whereby an accounting change proposed by the FASB was considered "outside the control of carriers" (requiring exogenous treatment) once it had been "actually approved" by the FASB and the Commission had not objected within ninety days to a carrier's notification that it would implement the change, *see id.* at 7681. The Commission

concluded that "Verizon has justified exogenous treatment for accrued OPEB costs for the years 1991 and 1992" because the costs "were associated with implementing a FASB-prescribed change in the GAAP that the Commission had approved and had directed to be put into effect 'on or before January 1, 1993.'" *Id.* at 7682. Rejecting AT&T's view that Verizon actually had control over the costs because it did not have to implement SFAS-106 until the Commission deadline of January 1, 1993, the Commission explained that the real "control" test turned on "whether the accounting change itself was 'mandated by the Commission.'" *Id.* at 7684. Verizon's early implementation of the change — in accordance with the encouragement of the FASB and the Commission — thus did not make its compliance with SFAS-106 "voluntary."

The Commission also approved the LECs' 1996 filings seeking exogenous increases in their PCIs to recoup the sharing obligations they incurred from understating their rate bases while *RAO Letter 20* was effective. *Id.* at 7695-96. The Commission ruled that its pre-1997 rate base rules required the LECs to include accrued OPEB costs in the rate base. *Id.* at 7689-90. Because the LECs were obliged to comply with *RAO Letter 20* until it was rescinded, the Commission found it reasonable that the LECs adjusted their computations to comport with the correct regulatory interpretation after the rescission. *See id.* at 7693-95. The Commission therefore concluded that it should permit exogenous treatment to "put[] the parties in the position they would have been in had the error not been made" and to "rectify the effects of the vacated *RAO Letter 20*." *Id.* at 7695. In response to AT&T's claim that the PCI increases were precluded by two rules — 47 C.F.R. § 65.600(d)(2), which bars rate base changes more than fifteen months after the calendar year to which the rate base calculations apply, and 47 C.F.R. § 61.45(d), which prohibits exogenous adjustments without a rulemaking, rule waiver, or declaratory ruling — the

Commission, assuming the rules applied, waived them. *Id.* at 7694. The Commission found that it would be "inequitable" to enforce the fifteen-month deadline because "[t]hese carriers hardly could have been expected to file rate base adjustments reversing the effects of the *RAO Letter 20 before* the Commission vacated that staff decision in 1996." *Id.* at 7695. "Given the unusual circumstances," the Commission also found that "the public interest is served by a waiver" of 47 C.F.R. § 61.45, which when combined with the *1995 Price Cap Order* limits exogenous cost adjustments to economic cost changes, because a waiver "enable[s] the LECs to rectify the effects of the vacated *RAO Letter 20* and [ensures] that their rate bases are consistent with the agency's regulations." *Id.*

## II.

AT&T challenges the Commission's rulings in the *Order* as arbitrary and capricious. Under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the court's review is deferential. *See Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 300 (D.C. Cir. 2003). The burden lies with AT&T to show that the Commission failed to consider relevant factors or made a manifest error in judgment. *See id.*; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971). That standard applies to review of a Commission decision to waive its rules. *See AT&T Wireless Servs., Inc. v. FCC*, 270 F.3d 959, 965 (D.C. Cir. 2001). Moreover, an agency's interpretation of its own orders and rules is entitled to substantial deference. *See Lyng v. Payne*, 476 U.S. 926, 939 (1986); *MCI Worldcom Network Servs., Inc. v. FCC*, 274 F.3d 542, 547 (D.C. Cir. 2001).

### A.

AT&T contends that the Commission's approval of the

increase in Verizon's tariffs based on 1991 and 1992 OPEB costs was arbitrary and capricious because these costs were not beyond Verizon's control but resulted from Verizon's decision to implement SFAS-106 before the January 1, 1993 deadline for all carriers to make the accounting change and before the FASB's December 15, 1992 "effective date." According to AT&T, the rate increases were barred by two separate rules in effect at the time the tariffs were filed.

The first rule permits exogenous treatment only for costs that are "beyond the control of the carrier[]." *1990 Price Cap Order*, 5 F.C.C.R. at 6807. The Commission interprets its control test simply to ask *why* a cost change occurs, not *when* it occurs. *See Order*, 20 F.C.C.R. at 7684. Costs imposed by regulation are categorically beyond the carrier's control, even if the carrier has the option of incurring the cost before a deadline rather than at the deadline. The Commission compares a carrier changing its accounting practices to a taxpayer filing a return: Filing a tax return is no less mandatory because the taxpayer has the option of filing on April 1 rather than April 15. *See id.* Similarly, Verizon's implementation of SFAS-106 before January 1, 1993 did not bring the costs within its control. *See id.*

The Commission's categorical definition of "control" is bolstered by *Southwestern Bell*. There, the court concluded that OPEB costs should not be denied exogenous treatment because LECs have some control over the level and timing of underlying expenses, stating that a "FASB change adopted by the Commission is not a change under control of the carrier, and, once mandated by the Commission, the change satisfies the control criterion." *Southwestern Bell*, 28 F.3d at 170. *Southwestern Bell* did not decide the question presented because AT&T does not contend that the level and timing of the OPEB expenses place these costs within Verizon's control but rather

that the accounting change itself was within Verizon's control during 1991 and 1992. Nevertheless, *Southwestern Bell* indicates the limited nature of the Commission's control inquiry, which for a GAAP change turns solely on whether it is adopted by the Commission as consistent with its regulatory objectives. *See id.* Given the historically limited nature of the control test, AT&T cannot point to any Commission rule or order that contradicts the Commission's interpretation of the test as requiring exogenous treatment for any cost changes resulting from a "GAAP change . . . adopted by the FASB and mandated by the Commission." *Order*, 20 F.C.C.R. at 7684. In light of the deference courts accord to agencies in interpreting their own rules, *see Capital Network Sys., Inc. v. FCC*, 28 F.3d 201, 206 (D.C. Cir. 1994), we find no reason to conclude that the Commission was arbitrary or capricious in treating Verizon's implementation of SFAS-106 as beyond its control.

Second, AT&T contends that the Commission erred in treating Verizon's pre-1993 OPEB costs exogenously because the Commission violated its own rule that "no GAAP change can be given exogenous treatment until [FASB] has actually approved the change and it has become effective." *1990 Price Cap Order*, 5 F.C.C.R. at 6807. The nub of the parties' dispute is over what it means for an accounting change to "become effective." The FASB announced that SFAS-106 "shall be effective for fiscal years beginning after December 15, 1992." The Commission rejected AT&T's argument that a rule must "become effective" on the effective date provided by the promulgator of the rule. Not only had the FASB affirmatively encouraged firms to put SFAS-106 in place before that date, *see Order*, 20 F.C.C.R. at 7683, but "[m]ore significantly, Verizon implemented SFAS-106 after the Commission's staff under delegated authority directed carriers to put SFAS-106 in effect 'on or before January 1, 1993 as a mandatory practice for purposes of the [regulatory accounting system].'" *Id.*

Because the question of when an accounting change "become[s] effective" is subject to a number of reasonable interpretations, for a LEC regulated by the Commission, it is plausible to say that a change "become[s] effective" for Commission purposes when the Commission authorizes it to put that change into effect, even if the FASB does not yet consider it effective. Indeed, it would be strange for the Commission to encourage adoption of an accounting change but to require a carrier to pretend that the change had not occurred for ratemaking purposes until the FASB effective date arrived. Both the Commission and the FASB encouraged early implementation, and absent a prior Commission order treating the FASB's "effective date" as controlling, the Commission's plausible interpretation of its 1990 order is due deference by the court. *See Capital Network Sys.*, 28 F.3d at 206. Although AT&T maintains that the Commission's interpretation created unfair outcomes because LECs controlled their own effective date for the accounting change, ultimate control rested with the Commission, which made the change effective when it approved implementation of SFAS-106. And, as Verizon explains, its earlier recognition of OPEB costs meant that it would have stopped benefitting from OPEB recognition earlier than other carriers because the transitional costs were to be amortized over twenty years. Had the Commission policy on OPEB costs remained constant, Verizon would have stopped recognizing its OPEB costs years before the other LECs. Therefore, AT&T's concern about strategic manipulation of exogenous costs is misplaced.

**B.**

AT&T also contends that the Commission's approval of the exogenous rate increases in the LECs' 1996 tariffs was unlawful because it required an arbitrary and capricious waiver of the price cap rules.

For "good cause," the Commission may waive "[a]ny provision of the rules." 47 C.F.R. § 1.3. A waiver is permissible "where particular facts would make strict compliance inconsistent with the public interest." *Northeast Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990). The Commission concluded that waivers were necessary to "permit[] the LECs to correct the errors arising solely from their compliance with the staff's legally deficient [*RAO Letter 20*] order." *Order*, 20 F.C.C.R. at 7695. As the court has exhorted, "when the Commission commits legal error, the proper remedy is one that puts the parties in the position they would have been in had the error not been made." *Exxon Co. v. FERC*, 182 F.3d 30 (D.C. Cir. 1999) (quoting *Public Utils. Comm'n of Cal. v. FERC*, 988 F.2d 154, 168 (D.C. Cir. 1993)). The Commission found that *RAO Letter 20* was legal error, *see* Order, *RAO Letter 20*, 11 F.C.C.R. at 2961, and that the error harmed the LECs because their rate bases were artificially depressed, driving up their reported rates of return and, in turn, their sharing obligations. *See Order*, 20 F.C.C.R. at 7677. Thus, the Commission characterizes the waivers as "an exercise in error correction," *Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1111 (D.C. Cir. 2001), within its authority to "undo what was wrongfully done," *Se. Mich. Gas. Co. v. FERC*, 133 F.3d 34, 42 (D.C. Cir. 1998) (quoting *United Gas Improvement Co. v. Callery Props., Inc.*, 382 U.S. 223, 229 (1965)) (alteration omitted).

However, AT&T contends that the Commission failed to explain adequately why it would allow price increases in contravention of its rule that accounting changes without economic effect should not be treated exogenously. Rule 61.45(d) provides that carriers may receive exogenous treatment only for "cost changes that the Commission shall permit or require by rule, rule waiver, or declaratory ruling." 47 C.F.R § 61.45. In the *1995 Price Cap Order*, the Commission

determined that accounting changes that do not represent actual increases in economic costs, like the SFAS-106 changes for OPEBs, could not receive exogenous treatment. *See 1995 Price Cap Order*, 10 F.C.C.R. at 9089-97. The Commission here assumed without deciding that Rule 61.45, when combined with the 1995 order, would bar exogenous treatment of the OPEBs at issue despite the fact that they accrued in years before the 1995 order. *See Order*, 20 F.C.C.R. at 7694. AT&T maintains that the Commission's decision produced an economic result — allowing OPEB costs to affect rates — that the Commission has rejected as unsound policy.

Although the Commission eventually implemented the policy of *RAO Letter 20* through a rulemaking, *see* Report and Order, *Responsible Accounting Officer Letter 20, et al.*, 12 F.C.C.R. 2321, 2325-26 (1997), such that the LECs would not thereafter be able to recover for accrued OPEB costs, that does not render the letter harmless. The Commission's 1995 prospective adoption of exogenous cost rules did not eliminate the LECs' obligation to comply with the rate base rules in effect from 1992 to 1995. As "it is elementary that an agency must adhere to its own rules and regulations," *Reuters Ltd. v. FCC*, 781 F.2d 946, 950 (D.C. Cir. 1986), the Commission understandably insisted on applying the regulations that were in effect at the time of the accounting. *See Order*, 20 F.C.C.R at 7693 & n.169 (citing *Southwestern Bell*, 28 F.3d at 169). Consequently, it was neither arbitrary nor capricious for the Commission to waive its rule to assure that it abided by its own regulations and ameliorated the harm to the LECs created by the staff error.

AT&T's invocation of policy considerations is unpersuasive. AT&T's claim that the Commission lacked good cause to waive its rules because the LECs would be free to restate their rate bases without a waiver ignores the fact that,

absent a waiver of the exogenous cost rule, the restatements would have no economic effect and the Commission would be unable to put the parties in the positions they would have been in absent *RAO Letter 20*. Contrary to AT&T's view that the Commission did not explain why it was more concerned with adhering to its rate base rules than to the exogenous cost rules, it is clear from the *Order* that the Commission considered it more important to ensure consistency with the rules in place during the years of the accounting than to ensure consistency with rules that were not promulgated until after the costs accrued. *See Order*, 20 F.C.C.R. at 7693.

AT&T's suggestion that because there was no wrong to undo, the Commission could not rely on its discretion to "undo what was wrongfully done," *Se. Mich. Gas. Co.*, 133 F.3d at 42, recasts regulatory history. Although the policy in *RAO Letter 20* was later endorsed by the Commission, AT&T's attempt to cast the Commission's rescission of *RAO Letter 20* as premised on a mere procedural error is contrary to the Commission's conclusion that its rescission of *RAO Letter 20* was an authoritative interpretation of Commission rules requiring the LECs to include rather than exclude OPEB costs from the rate base. *See Order*, 20 F.C.C.R. at 7693-94. The regulatory history indicates, despite AT&T's claim that the Commission always intended to exclude OPEBs from the rate base, that the Commission's attitude was somewhat unsettled. *See id.* at 7690 & n.147 (citing 2 F.C.C.R. 332, 337 (1987)). To deny the LECs' 1996 attempt to recover for the understated rate bases while *RAO Letter 20* controlled would be to deny any effect to the Commission's rescission of the letter.

Again, the Commission could reasonably conclude that it would be inequitable not to waive the fifteen-month deadline in 47 C.F.R. § 65.600(d) because "the LECs had a statutory obligation to adhere to the *RAO Letter 20* during the time period

in which that order was in effect," and the "carriers hardly could have been expected to file rate base adjustments reversing the effects of the *RAO Letter 20 before* the Commission vacated that staff decision." *Order*, 20 F.C.C.R. at 7694-95. Because the rate base rule in effect at the time of the accounting required LECs to include OPEBs in their rate bases, *see* 47 C.F.R. § 65.830 (1992), there is no inconsistency in the Commission's decision to waive the deadline to implement the law in effect at the time rather than to implement the policy it later adopted through rulemaking.

Delving into pure conjecture, AT&T persists that even if the Commission was justified in waiving its rules to some extent to correct for *RAO Letter 20*, it was improper to waive the rules for the entire period because if the staff had recognized that the rate base rule actually required inclusion of OPEBs, it would not have issued *RAO Letter 20* and the Commission would have addressed the issue earlier by promulgating a rule excluding OPEBs from the rate base. However likely this speculation about what might have happened had the Commission staff not erred, it is insufficient to force the LECs to bear the burden of the staff error.

Finally, whatever the requirements of the Commission's regulations, AT&T protests that the Commission violated the underlying statute by failing to consider whether the rates that allowed recovery for OPEB costs were "just and reasonable" under § 201(b) of the Communications Act. *See* 47 U.S.C. § 201(b). If the old rate base rule, 47 C.F.R. § 65.830 (1992), or any other regulations led to "unjust or unreasonable" rates, AT&T maintains that the Commission was obliged to depart from those regulations to meet its statutory obligation. Although the Commission, as a creature of statute, is bound by its congressional mandate, § 201(b) does not demand a full-fledged "just and reasonable" analysis in every case. *See* 47 U.S.C.

§ 154(j). The Commission has the authority to determine the scope of its investigations, *id.* § 204(a); *FCC v. Schreiber*, 381 U.S. 279, 289 (1965), and AT&T has no authority to force a separate inquiry by the Commission without filing a complaint under 47 U.S.C. § 208. Moreover, AT&T suggests no means by which the Commission might determine whether these rates are just and reasonable beyond determining whether they were calculated in accordance with price cap regulations, which, as the Commission observes, are designed to produce just and reasonable rates. *See 1990 Price Cap Order*, 5 F.C.C.R. at 6787-88; *Policy and Rules Concerning Rates for Dominant Carriers*, 6 F.C.C.R. 2637, 2731 (1991). Because the ultimate issue in any Commission tariff investigation is whether the underlying rates are "just and reasonable," *see* 47 U.S.C. §§ 201(b), 204(a), in determining that the LECs' filings complied with the then-applicable price cap rules, the Commission was determining that the PCIs were just and reasonable. Even when the Commission chose to bar exogenous treatment of OPEB costs in 1995, it did not do so on the ground that exogenous treatment had created unjust or unreasonable rates. *See 1995 Price Cap Order*, 10 F.C.C.R. at 9096. To the contrary, it directed that its ruling would only operate prospectively. *See id.*

Accordingly, because the Commission's interpretation of its control test is consistent with precedent and the Commission's approval of the 1996 tariffs had the effect of placing the LECs in the position they would have been in had the staff not erred, we conclude that AT&T has failed to show that the Commission's rulings were arbitrary and capricious, and we deny the petition for review.