**CONSOLIDATED RAIL CORPORATION,**
Petitioner,

v.

**INTERSTATE COMMERCE COM-
MISSION; United States of
America, Respondents,**

**Delaware & Hudson Railway
Company, Intervenor.**

No. 93–1390.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 18, 1994.

Decided Jan. 20, 1995.

Robert M. Jenkins III, with whom Paul A. Cunningham, Joel A. Rabinovitz, Washington, DC, Constance L. Adams, and Anne E. Treadway, Philadelphia, PA, were on the briefs, for petitioner. Jonathan M. Broder, Philadelphia, PA, entered an appearance for petitioner.

Laurence H. Schecker, Attorney, Interstate Commerce Commission ("ICC"), with whom Henri F. Rush, General Counsel, John J. McCarthy, Jr., Associate General Counsel, ICC, and Anne K. Bingaman, Asst. Atty. Gen., John J. Powers III, and John P. Fonte, Attorneys, U.S. Dept. of Justice, Washington, DC, were on the briefs, for respondents.

Terence M. Hynes, David M. Levy, and Krista L. Edwards, Washington, DC, were on the brief for intervenor.

Before BUCKLEY, WILLIAMS, and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Consolidated Rail Corporation ("Conrail") petitions for review of a 1993 order of the Interstate Commerce Commission that interpreted one prior Commission order and denied Conrail's motion to vacate another. The Delaware and Hudson Railway Company, Inc. ("DHRC"), a subsidiary of Canadian Pacific Limited, intervened in support of the ICC's 1993 order. As we reject the Commission's interpretation of the one order and uphold its denial of Conrail's motion to vacate the other, we grant the petition in part and deny it in part.

## I. BACKGROUND

### A. Legal Framework

#### 1. Trackage rights

Following the bankruptcy of several major northeastern and midwestern railroads, Congress enacted the Regional Rail Reorganization Act of 1973, 45 U.S.C. §§ 701 et seq. (1988), which provided for the creation of both Conrail and the United States Railway Association ("USRA"). The latter was as-

signed the task of reorganizing "the railroads ... into a single, viable system operated by a private, for-profit corporation." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 109, 95 S.Ct. 335, 342, 42 L.Ed.2d 320 (1974). In due course, the USRA adopted a Final System Plan ("FSP") that "transferred approximately 70% of the lines" of six bankrupt northeastern railroads to Conrail. *Pennsylvania v. ICC,* 590 F.2d 1187, 1189 (D.C.Cir. 1978).

To facilitate rail competition, the FSP granted other surviving railroads "trackage rights" over Conrail's lines. A railroad holding trackage rights may operate its own trains over the tracks of another. *See Simmons v. ICC,* 871 F.2d 702, 712 (7th Cir. 1989). In particular, the FSP, as modified, granted the DHRC's predecessor-in-interest, the Delaware and Hudson Railway Company ("D & H"), trackage rights over Conrail's lines to Park Junction in northwest Philadelphia. Final System Plan: Modifications, Supplements or Additions to Designation of Rail Properties, 41 Fed.Reg. 8846, 8849 (1976).

2. Switching rights

 Section 223 of the Staggers Rail Act of 1980 empowers the Interstate Commerce Commission to

> require rail carriers to enter into reciprocal switching agreements, where it finds such agreements to be practicable and in the public interest, or where such agreements are necessary to provide competitive rail service.

49 U.S.C. § 11103(c)(1) (1988). A switching agreement requires a carrier that owns a line to move a competing carrier's cars to loading or unloading points on that line. Notwithstanding Congress's use of the word "reciprocal," the Commission may order one carrier to provide switching services to a competitor without requiring the competitor to reciprocate. *See generally Central States Enters., Inc. v. ICC,* 780 F.2d 664, 668 n. 1 (7th Cir.1985).

B. Procedural History

Petitioner now challenges the Commission's 1993 decision concerning the effects of orders it had issued in 1983 and 1990.

1. The 1983 Order

Pursuant to its authority under the Staggers Rail Act, in 1983 the Commission directed Conrail and D & H "to negotiate an agreement for reciprocal switching at Philadelphia, PA," and "[to] report to the [ICC], within 90 days ..., as to the success of those negotiations and the terms of any agreement that may be negotiated." *Delaware and Hudson Ry. Co. v. Consolidated Rail Corp.—Reciprocal Switching Agreement,* 367 I.C.C. 718, 732 (1983) ("1983 Order"). The Order also provided that if Conrail and D & H failed to reach such an agreement, "either party may file a petition within 30 days of the expiration of the negotiating period, requesting the Commission to determine just and reasonable conditions and compensation." *Id.* at 733.

The railroads sought and received three extensions of time within which to complete their negotiations, but they failed to reach an agreement. As a consequence, Conrail never provided switching services to D & H. In the meantime, a financially shaky D & H lost its struggle to survive; and, in 1988, it filed a petition in bankruptcy.

2. The 1990 Order

In 1990, D & H's trustee in bankruptcy ("Trustee") and Canadian Pacific Ltd. entered into an agreement by which Canadian Pacific, through its new subsidiary, DHRC, would purchase

> all the properties and business owned, held or operated by D & H ... including, without limitation, each of the following [properties listed]....

Asset Purchase Agreement at 13. Although D & H's *trackage* rights over lines owned by Conrail were among the properties specifically described, the agreement made no mention of any D & H *switching* rights over those lines.

As required by 49 U.S.C. § 11343(a) (1988), Canadian Pacific and the Trustee sought Commission approval of the sale by filing a railroad line purchase application. As in the case of the Asset Purchase Agree-

ment, the purchase application listed D & H's trackage rights but made no mention of switching rights. On October 5, 1990, the ICC approved DHRC's acquisition of "substantially all of the assets, properties and business of the" D & H. *Canadian Pacific Ltd.—Purchase and Trackage Rights—Delaware & Hudson Ry. Co.*, 7 I.C.C.2d 95, 97, 125 (1990) ("1990 Order").

On January 4, 1991, after the statutory period for clarification or review of the 1990 Order had expired, DHRC asked Conrail to "advise [DHRC] of the terms upon which Conrail will perform switching service at Philadelphia on [DHRC's] behalf." Conrail denied that the 1990 Order had authorized the transfer of D & H's switching rights to DHRC but agreed to negotiate regarding performing switching for DHRC at market rates. Those negotiations were unavailing.

### 3. The 1993 Order

In November 1991, Conrail filed a motion to vacate the 1983 switching rights decision. Conrail argued that vacatur was appropriate in light of both the factual and legal changes that had occurred since 1983 and D & H's failure to pursue its switching rights. Conrail also asserted that the 1990 Order had not approved the transfer of the switching rights to DHRC.

In a March 31, 1992, non-binding voting conference, the ICC tentatively decided to deny Conrail's motion to vacate and concluded that the 1990 Order had not approved the transfer of the switching rights. One week later, the DHRC and the Trustee submitted a letter to the ICC declaring that "both DHRC and the Trustee understood and agreed that the Philadelphia Switching Rights were, in fact, among the assets to be purchased by DHRC pursuant to the [Assets Purchase Agreement] approved by the Commission in" its 1990 Order.

The ICC issued its final determination on April 23, 1993. *Delaware and Hudson Ry. Co. v. Consolidated Rail Corp.—Reciprocal Switching Agreement*, 9 I.C.C.2d 989 (1993) ("1993 Order"). In it, the Commission held that the 1983 Order was not subject to a motion to vacate because it was a "final decision." *Id.* at 993. Accordingly, the

Commission treated Conrail's motion as a petition to reopen and denied the petition for failure to demonstrate changes in circumstances that would justify reconsideration of its action. *Id.* at 995, 997–99. *See* 49 U.S.C. § 10327(g)(1) (1988) (Commission may reconsider action on basis of "substantially changed circumstances"); 49 C.F.R. § 1115.4 (1993) (permitting a petition to reopen "any administratively final action of the Commission"). Reversing its tentative conclusion at the voting conference, the Commission also determined that the 1990 Order had authorized the transfer of the switching rights. *Id.* at 1002.

Conrail seeks review of the 1993 Order, arguing that it was arbitrary and capricious, or otherwise contrary to law. *See* 5 U.S.C. § 706(2)(A) (1988); *see also Central States,* 780 F.2d at 673 (applying § 706(2)(A) to ICC proceedings).

## II. DISCUSSION

### A. Finality of the 1983 Order

■ Conrail challenges the characterization of its motion to vacate the 1983 Order as a petition to reopen under 49 U.S.C. § 10327(g)(1), which, Conrail contends, imposed a much higher standard of proof than would have been appropriate for a motion to vacate an ongoing proceeding. Section 10327(g)(1) allows a party to petition to reopen a proceeding "under regulations of the Commission." 49 U.S.C. § 10327(g)(1). The regulations provide that one may "petition to reopen any administratively *final* action of the Commission...." 49 C.F.R. § 1115.4 (emphasis added). Noting that the 1983 Order "merely required" the parties to negotiate the conditions and terms of compensation for Philadelphia switching and that the parties were to return to the Commission if they were unable to reach an agreement, Conrail insists that the Commission erred as a matter of law when it concluded that the 1983 Order was final.

In arguing that the decision lacked finality because it did not represent the "terminal, complete resolution of the case before the agency," *Capital Network System, Inc. v. FCC,* 3 F.3d 1526, 1530 (D.C.Cir.1993), Con-

rail relied on cases that were concerned with whether a particular agency decision was "final" for purposes of judicial review. In this case, however, whether the 1983 Order constituted a final decision for purposes of judicial review is irrelevant. The question before us is whether the Commission, not a court, could consider its previous decision final for the purpose of treating Conrail's motion to vacate as one to reopen under 49 C.F.R. § 1115.4.

■ As this question involves the ICC's application of its own regulations, we owe it special deference. See *Capital Network System, Inc. v. FCC*, 28 F.3d 201, 206 (D.C.Cir. 1994) (courts owe "even greater deference to agency interpretations of agency rules than ... to agency interpretations of ambiguous statutory terms"). Moreover, we will not upset the Commission's conclusion that the 1983 Order was "final" for the purposes of section 1115.4 unless that conclusion was "plainly erroneous or inconsistent with the regulation." *Railway Labor Executives' Ass'n v. United States*, 987 F.2d 806, 818 (D.C.Cir.1993) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).

We see no basis for concluding that the Commission erred in holding that the 1983 Order was final within the meaning of its own regulations. That order established D & H's right to receive, and Conrail's obligation to provide, switching rights. While it is true that the parties had the right to return the matter to the Commission if they proved unable to agree on the conditions and terms of compensation, the 1983 Order awarding switching rights to D & H could have been the Commission's last action in this dispute. We cannot say the Commission's determination as to the finality of such an order for the purposes of section 1115.4 was plainly wrong. Accordingly, we deny Conrail's petition for review insofar as it challenges the Commission's conclusion that Conrail's motion to vacate should be treated as a motion to reopen.

## B. The 1990 and 1993 Orders

■ Conrail also challenges the Commission's 1993 conclusion that its 1990 Order approved the transfer of D & H's Philadelphia switching rights to DHRC. The Commission asserts that we are without jurisdiction to consider this particular challenge because its conclusion that the 1990 Order had approved the transfer of the switching rights constituted no more than a clarification of its effect, citing *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987). In that case, the Brotherhood sought judicial review of the denial of its "Petition for Clarification." The Supreme Court ruled that if the petition sought

> nothing more than specification, one way or the other, of what the original order meant with regard to crewing rights—then the denial is unappealable because [the Brotherhood] was not 'aggrieved' by it within the meaning of the Hobbs Act [28 U.S.C. § 2344].

*Id.* at 285, 107 S.Ct. at 2369. The Court continued that if the Brotherhood in fact sought to reopen the case in order to "urge[ ] the Commission to correct what [it] thought to be a serious error of law," the petition was still unreviewable because that purpose should have been pursued by an appeal from the original order within the 60–day period provided by the Hobbs Act. *Id.* at 286, 107 S.Ct. at 2369–70. The Court noted, however, that

> [i]f ... the ICC's action[ ] had gone beyond what was (at most) clarification of an ambiguity, and in the guise of interpreting the original order in fact *revised* it, that would have been a new order immediately appealable.

*Id.* (emphasis in original).

Conrail maintains, and we agree, that the 1993 Order effected a revision of the 1990 Order. It bases its position on the same paragraph of the opinion on which the ICC relies for its contrary conclusion. This paragraph reads, in relevant part, as follows:

> [O]ur approval of this ... application contemplates the substitution of [DHRC] for D & H with regard to the trackage rights granted in the FSP, *as well as D & H's trackage rights to Philadelphia over lines owned by Conrail*.... D & H is the only single-system alternative to Conrail in

most of the major markets of the Northeast and the trackage rights are already in place and were originally provided to preserve or foster competition with Conrail in the Northeastern United States. Similarly, *the Philadelphia trackage rights were granted by the Commission* to protect the public interest by providing a competitive counterbalance to Conrail at Philadelphia.... We find that *these trackage rights* currently held by D & H continue to be in the public interest as a means of providing viable competition for Conrail in the Northeast, just as they were when the FSP was formulated and *when the trackage rights to Philadelphia were originally granted.* Accordingly, our approval here requires transfer of D & H's FSP and *the Commission-imposed Philadelphia rights....*

1990 Order, 7 I.C.C.2d at 117–18 (emphasis added, citations omitted).

■ The Commission seizes on the phrase, "Commission-imposed Philadelphia rights," in the last sentence quoted above and construes it to encompass the Philadelphia reciprocal switching rights. 1993 Order, 9 I.C.C.2d at 1001–02. We agree with Conrail, however, that, read in context, that phrase can only have referred to trackage rights. "Commission-imposed Philadelphia rights" clearly refers to the earlier passage in the paragraph in which the Commission distinguished between the trackage rights granted D & H by the USRA in its FSP and "the Philadelphia trackage rights ... granted by the Commission...." 1990 Order, 7 I.C.C.2d at 117–18. The reference cannot have been to the Philadelphia switching rights, as switching rights are mentioned nowhere in that paragraph—indeed, nowhere in the Commission's 1990 opinion.

This reading, moreover, is compelled by the location of the paragraph within the 1990 opinion. It appears in the middle of the Commission's discussion of "Sub–No. 6" of the Railroad Line Purchase Application. *Id.* Sub–No. 6 reads, in relevant part, as follows:

Applicants [Canadian Pacific and DHRC] seek approval of the acquisition by [DHRC] of trackage rights through assignment from the Trustee over the following

lines of Conrail: ... (5) between Allentown, PA and Philadelphia, PA....

Because Sub–No. 6 dealt exclusively with the DHRC's proposed acquisition of D & H's trackage rights over the Conrail lines specified therein, the reference to "Philadelphia rights" would not have encompassed reciprocal switching rights.

The Commission concedes, in its brief, that the language of the 1990 Order "may have been imprecise." Respondents' Joint Brief at 15, n. 8. Nonetheless, it defends its 1993 conclusion on the basis that the only Commission-imposed rights *in* Philadelphia were the reciprocal switching rights. In addition, intervenor DHRC notes that the 1990 Order indicated that the Commission had hoped to provide a competitive alternative to Conrail in the Philadelphia area and that the 1983 Order had granted the switching rights in large part to further that goal, citing the 1990 Order, 7 I.C.C.2d at 118, and the 1983 Order, 367 I.C.C. at 723.

In so arguing, the Commission and the intervenor are in effect asking us to uphold the 1993 Order on the ground that the 1990 Order meant to include switching rights when it spoke of trackage rights. As Commissioner Walden noted in a dissenting opinion, that conclusion ignores the distinction between the two. 1993 Order, 9 I.C.C.2d at 1009 (Walden, dissenting in part).

Finally, the Commission points out that its 1990 Order approved a railroad line purchase application that sought authority for the DHRC's "acquisition of substantially all of [D & H's] assets, properties and business," 1990 Order, 7 I.C.C.2d at 97, 125, implying that, although the switching rights were not listed in the application, they were encompassed by that catch-all phrase. The Commission also suggests that the switching rights were included within the Asset Purchase Agreement's reference to the transfer of governmental permits, licenses, and authorizations. These arguments, however, do not support the ICC's reading of the phrase "Commission-imposed Philadelphia rights." That phrase appears in the middle of a discussion of Sub–No. 6 of the application, which, as we noted above, sought approval for the transfer

of D & H's trackage rights over lines owned by Conrail.

### III. CONCLUSION

For the foregoing reasons, we hold that the Commission did not act arbitrarily in treating Conrail's motion to vacate as one to reopen and in denying the motion. We conclude, however, that the 1990 Order did not authorize the transfer of the Philadelphia switching rights. We also conclude that the 1993 Order represented a revision rather than a clarification of the 1990 Order and is therefore subject to judicial review. Accordingly, we deny Conrail's petition for review to the extent that it challenges the Commission's decision to treat its motion to vacate as a motion to reopen, and we grant it to the extent that it challenges the Commission's conclusion that the 1990 Order approved the transfer of the switching rights.

*So ordered.*