**Melinda BIRT, Petitioner,**

v.

**SURFACE TRANSPORTATION BOARD, et al., Respondents,**

**Union Pacific Railroad Company and City of Nampa, Idaho, Intervenors.**

**No. 95–1211.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1996.

Decided August 2, 1996.

Nels J. Ackerson, Washington, DC, argued the cause and filed the briefs for petitioner.

Evelyn G. Kitay, Attorney, Surface Transportation Board, Washington, DC, argued the cause for respondents, with whom Henri F. Rush, General Counsel, Ellen D. Hanson, Deputy General Counsel and Jeffrey P. Kehne, Attorney, United States Department of Justice, were on the brief for respondents. J. Carol Williams entered an appearance.

Joseph D. Anthofer, Omaha, NE, Eric S. Rossman and William A. Morrow, Nampa, ID, were on the brief for intervenors.

Charles H. Montange and Andrea C. Ferster, Washington, DC, were on the brief for amicus curiae.

Before: EDWARDS, Chief Judge, WALD and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge SENTELLE.

WALD, Circuit Judge:

Petitioner Melinda Birt owns a parcel of land in Canyon County, Idaho, across which intervenor Union Pacific Railroad Company ("UP") held a right-of-way for its railroad tracks.[1] In April of 1993, UP sought to

---

1. In proceedings before the Interstate Commerce Commission ("ICC" or "Commission"), Birt in-dicated that she represented over 40 other land-owners who also owned property adjacent to the

abandon a 16–mile segment of the line running through Canyon County, presumably because its operation was no longer profitable. Shortly thereafter, the city of Nampa, which lies near the stretch of tracks in question, indicated its interest in using the land for a nature trail pursuant to the Trails Act. The Trails Act allows a sponsoring organization to develop an unused railroad track for recreational or conservational purposes; under a "rails to trails" arrangement, the railroad does not relinquish its right to use the easement in the future, thereby preventing the reversionary interests of adjoining landowners (such as Birt) from vesting. In February of 1995, after the ICC granted several extensions in the time allotted for negotiating a rails-to-trails deal—the first of which was retroactive—UP and Nampa reached agreement and the ICC [2] approved the conversion.

Birt petitions for review of the ICC's decisions granting extensions for negotiation and final approval of the agreement. She argues that UP had already abandoned the track before these decisions were issued, depriving the Commission of jurisdiction over UP's right-of-way. Birt also contends that the Commission lacked authority to retroactively extend the negotiating deadline. We reject both arguments. As to the first, we think that UP failed to demonstrate the requisite intent to abandon the track prior to finalizing the conversion agreement, and thus the Commission still had jurisdiction over the right-of-way when it issued the extensions and approval order. Secondly, we find that the ICC acted within its discretion in extending the negotiating period. Accordingly, we affirm the Commission's order approving the UP/Nampa rails-to-trails agreement.

## I. BACKGROUND

### A. "Rails–to–Trails" Conversions

For generations, American railroads played a critical role in our nation's economic development, at peak accounting for 272,000 miles of trackage in the 1920s.[3] *Preseault v. ICC,* 494 U.S. 1, 5, 110 S.Ct. 914, 918, 108 L.Ed.2d 1 (1990). Today, only 141,000 miles remain, and the system continues to lose an additional 3,000 miles each year. *Id.* Due to the competition of cars, trucks, buses, and planes, traffic on many rail lines has deteriorated to the point of unprofitability. Before it can cease service on an established line, however, a railroad must obtain a "certificate of abandonment" from the ICC. If granted, the railroad's rights-of-way generally revert back to the adjoining landowners across whose property the tracks run. Confronted with the Hobson's choice of forfeiting a national rail system through piecemeal abandonment of lines, or forcing railroads to maintain tracks on which they cannot turn a profit, Congress developed a third option: converting "rails" to "trails."[4] Section 1247(d) of the Trails Act [5] permits a railroad

---

UP tracks. However, she has filed in this court only on her own behalf.

2. On January 1, 1996, the ICC ceased to exist and its duties were transferred to the Surface Transportation Board ("STB"), in the Department of Transportation. ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803 (1995). Accordingly, the STB has replaced the ICC as the respondent in this case.

3. For a glimpse of the extraordinary symbolic and cultural importance once accorded railroads, see Walt Whitman, *Passage to India*:

Singing the great achievements of the present,
Singing the strong light works of engineers,
Our modern wonders, (the antique ponderous Seven outvied), In the Old World the east the Suez canal, The New by its mighty railroad spann'd....
I see over my own continent the Pacific railroad surmounting every barrier, I see continual trains of cars winding along the Platte

carrying freight and passengers, I hear the locomotives rushing and roaring, and the shrill steam-whistle, I hear the echoes reverberate through the grandest scenery in the world.

4. The Supreme Court has provided a thorough explanation of the history and goals of the Trails Act in a decision affirming the constitutionality of the statute. *See Preseault,* 494 U.S. at 5–7, 110 S.Ct. at 918–19.

5. Section 1247(d) provides:

The Secretary of Transportation, the Chairman of the Interstate Commerce Commission, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976, shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs. Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established rights-of-way for

seeking to abandon a line to instead negotiate with a state or local government or private organization to assume financial and legal responsibility for the track. Under a "rails-to-trails" agreement, the railroad's right-of-way is transferred to the third-party sponsor for interim recreational or conservational purposes. Because this transfer is deemed by statute not to constitute an abandonment of the line, the reversionary interests of adjoining landowners do not vest, even though the railroad ceases service and takes up the tracks. The rail line instead retains the right to reassert control over the easement at some point in the future if it decides to revive rail service.

The regulations implementing § 1247(d) direct a potential third-party sponsor to file a statement with the ICC expressing interest in a rails-to-trails conversion and offering to assume financial and legal responsibility for the trail. 49 C.F.R. § 1152.29(a) (1996). If the third party has fully complied with the filing requirements and the railroad agrees to negotiate, the Commission will then issue a "Certificate of Interim Trail Use" ("CITU").[6] A CITU stays the railroad's certificate of abandonment for 180 days, during which time the parties may negotiate over interim trail use. *Id.* § 1152.29(c)(1). During that time period, the railroad may take certain actions which are consistent with either discontinuing service as part of a trails conversion or full abandonment of the line: discontinuance of rail service, cancellation of tariffs, and removal of tracks. *Id.* If the parties reach agreement prior to expiration of the CITU, the sponsor takes over management of the right-of-way, subject to the railroad's option to reassert control over the line. If the parties do not reach agreement, the certificate of abandonment becomes effective upon expiration of the CITU. *Id.* ("[t]he CITU will ... permit the railroad to fully abandon the line if no agreement is reached 180 days after it is issued"). Once in possession of an effective abandonment certificate, the railroad may at any time thereafter exercise its option to fully abandon the line by clearly exhibiting its intent to do so.

B. *UP/Nampa Trail Use Agreement*

In April of 1993, UP applied to the ICC for an abandonment certificate covering a 16-mile stretch of tracks outside Nampa called the "Stoddard Branch."[7] The railroad proffered several justifications for abandonment: a major shipper on the line had ceased rail shipments; remaining traffic on the line was insufficient to offset maintenance and operation costs; and there were no reasonable prospects of enough income to justify continued operation of the line. A month later, the City of Nampa[8] wrote to the ICC indicating

future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes. If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Commission shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.
16 U.S.C. § 1247(d) (1994).

6. In "regulated abandonment proceedings," the customary procedure for requesting abandonment, the Commission issues a "CITU." In "exemption proceedings," which are abbreviated procedures available if no traffic has run on the line for at least two years, the Commission will issue a "Notice of Interim Trail Use" ("NITU"). *See* 49 C.F.R. § 1152.29(d). The distinction is not relevant to our analysis here.

7. The portion of the "Stoddard Branch" which UP sought to abandon consists of 15.90 track miles and 1 mile of rail sidings, located near Nampa between milepost 1.75 and milepost 17.65. *See* UP Abandonment Application of 4/27/93 at 2 [JA at 19]; No. AB–33 (Sub–No. 79), *Union Pacific Railroad—Abandonment and Discontinuance of Operations—In Canyon and Ada Counties, ID (Stoddard Branch),* No. AB–33 (Sub–No. 79), 1993 ICC WL 405656 at *1 (Oct. 4, 1993).

8. Initially, Canyon County expressed an interest in joining with the City of Nampa to sponsor trail use on the Stoddard Branch, but withdrew its request prior to August of 1993.

its interest in negotiating a rails-to-trails agreement with UP so that a four-mile segment of the track could be used as a recreational trail. Nampa expressed its willingness to assume financial responsibility and legal liability for the line, and asked the Commission to issue a CITU staying UP's certificate of abandonment. In response, UP informed the Commission that it was willing to enter into a trail use agreement with the City of Nampa for part, but not all, of the segment which Nampa had identified. Following up on this correspondence, Nampa reiterated its interest in a trail agreement for the portion of the Stoddard Branch referenced by UP.

On October 4, 1993, the ICC approved UP's request for an abandonment certificate, but it did not impose a trail condition because Nampa had not yet fully complied with the filing requirements for trail sponsorship; on November 26, 1993, it issued the actual certificate of abandonment, to become effective December 26, 1993. During the same month, Nampa re-filed its trail use request with the Commission, properly complying with all the relevant statutory requirements, and UP filed a letter indicating it was agreeable to Nampa's request. In response, the Commission amended UP's certificate of abandonment on December 21, 1993 to issue a CITU for a portion of the Stoddard Branch running between milepost 1.75 and 5.62, giving both sides 180 days to negotiate a trail use agreement.[9] The Commission's authority to issue this initial CITU is not contested.

On June 10, 1994 (11 days before the end of the 180-day negotiating period), Nampa requested that the ICC extend the negotiation period, stating that "[t]he City has made an offer to the Railroad and the Railroad is in the process of evaluating it. We feel that a price can be negotiated in the near future." Three days later, UP sent a letter to the ICC stating it was agreeable to an extension. The Commission granted an extension of 60 days, but did not do so until June 29, 1994—8 days after the initial CITU had expired. On July 4 (five days after the extension was granted), Birt filed an opposition to Nampa's extension request, advancing the same argument she presses before us: that the ICC lacked jurisdiction to grant the extension because UP had already consummated the abandonment prior to expiration of the CITU by taking up the tracks and informing the Commission of its intent to abandon in a letter dated January 3, 1994. Birt then appealed the extension, contending, *inter alia*, that the right-of-way had been fully abandoned prior to the extension, and that "the CFR's" (presumably the ICC's abandonment regulations) did not authorize the Commission to issue extensions. Later on, the ICC granted two additional 30-day extensions timely requested by both sides.[10] On September 20, UP and Nampa signed a final trail use agreement, and the ICC approved that agreement in an order dated February 16, 1995. *Union Pacific Railroad—Abandonment and Discontinuance of Operations—In Canyon and Ada Counties, ID (Stoddard Branch)*, No. AB–33 (Sub–No. 79), 1995 WL 61495 (Feb. 16, 1995) [hereinafter *1995 UP Abandonment Decision*]. In that order, the Commission acknowledged that UP had taken up its tracks and referred to the line as "abandoned" in correspondence dated January 10, 1994, and May 23, 1994. *Id.* at *4. It concluded, however, that despite these actions, the railroad's continued willingness to negotiate a trails conversion indicated that it did not intend full abandonment. *Id.* at *5. The Commission also defended its right to retroactively extend a CITU, so long as the railroad had not yet consummated abandonment. *Id.* at *4.

Birt asks us to vacate the ICC's orders granting extensions of the CITU and approving the final conversion agreement. Her central argument is that during the eight day window of time between expiration of the

---

9. The ICC's order stated that, "If an agreement for interim trail use/rail banking is reached by the 180th day after service of this CITU, interim trail use may be implemented. If no agreement is reached by that time, UP may abandon the complete line." *Union Pacific Railroad—Abandonment and Discontinuance of Operations—In Canyon and Ada Counties, ID (Stoddard Branch)*,

No. AB–33 (Sub–No. 79), 1993 WL 542739 at *2 (Dec. 21, 1993).

10. Birt also appealed both of these subsequent extensions, raising substantially the same arguments she raised in the first appeal.

initial CITU and the first extension, UP consummated abandonment, thus depriving the ICC of further jurisdiction over the right-of-way and allowing the reversionary interests of Birt and her fellow landowners to vest. Under this theory, the ICC's order of June 29 granting a 60–day extension of the CITU, as well as the subsequent 30–day extensions and approval of the trail use agreement, were all for naught, since the Commission no longer had any authority over the line. We read her petition as also challenging the agency's authority to issue the first extension in June of 1994 retroactively—that is, eight days after expiration of the CITU. The ICC, for its part, reiterates the positions it took below: that UP did not demonstrate an intent to abandon the line, and that it acted properly in extending the UP/Nampa CITU. Ultimately, we find the Commission's analysis persuasive.

## II.  DISCUSSION

■ Under established precedent, petitioner is correct that if UP did consummate abandonment during the eight days in June between expiration and extension of the CITU, the ICC would have lost jurisdiction over the right-of-way at that time, and accordingly could not have granted the extension. *See, e.g., Preseault,* 494 U.S. at 5 n. 3, 110 S.Ct. at 919 n. 3 (ICC loses jurisdiction over railroad right-of-way upon abandonment of line); *Hayfield N. R.R. Co., Inc. v. Chicago N.W. Transp. Co.,* 467 U.S. 622, 633, 104 S.Ct. 2610, 2617, 81 L.Ed.2d 527 (1984) (same). The critical questions, then, are: First, was the Commission arbitrary and capricious in finding that UP did not consummate abandonment before the ICC issued its extension order on June 29, 1994? Second, was the ICC authorized to extend the CITU, even though it waited to do so until eight days after the CITU expired? Naturally, we review the Commission's construction of the Trails Act with deference, *see National Wildlife Fed'n v. ICC,* 850 F.2d 694, 699 (D.C.Cir.1988) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81

L.Ed.2d 694 (1984)), and we are mindful that the Commission has read § 1247(d) of the Act to reflect "a strong Congressional policy favoring trails use/rail banking." *St. Louis S.W. R.R. Co.—Abandonment—in Smith and Cherokee Counties, Texas,* No. AB–39 (Sub–No. 12), 1992 ICC WL 457275 at *3 (Mar. 23, 1992).

### A.  *UP Did Not Consummate Abandonment*

■ Birt contends that UP took all the steps necessary to fully abandon the Stoddard Branch before the CITU converted into a certificate of abandonment on June 21, 1994, and thus consummation occurred when the CITU lapsed.[11] Petitioner's argument on this point fails, however, because she has not successfully shown that UP intended to abandon the line. As this court noted in *Black v. ICC,* when considering whether a railroad has consummated abandonment, we must look to the carrier's intent:

[A] determination as to whether there is an "abandonment" should involve a more searching and functional inquiry about the actual intent of the parties to the transaction than the bare formalities addressed by the Commission here. As stated by the Eighth Circuit Court of Appeals, abandonment is characterized by an intention of the carrier to cease permanently or indefinitely all transportation service on the relevant line.... [I]t is the "intent" of the railroad—as evidenced by a spectrum of facts varying as appropriate from case to case—that should be the pivotal issue.

762 F.2d 106, 113 & n. 15 (D.C.Cir.1985) (internal quotations omitted). The Commission has listed several concrete actions which may indicate an intent to abandon: cessation of operations, cancellation of tariffs, salvage of the track and track materials, and relinquishment of control over the right-of-way. *Illinois Cent. Gulf R.R. Co.— Abandonment—in DeWitt and Piatt Counties, Illinois,* No. AB–43 (Sub–No. 134), 1988 WL 235412 at *5 (Dec. 19, 1988). These factors, however, are equally consis-

---

11. It is not contested that under ICC regulations, a CITU such as the one at issue here converts into an effective certificate of abandonment if no

trail use agreement is reached during the allotted period for negotiation. *See* Brief for Respondents at 17.

tent with temporary cessation of operations ("discontinuance"), which permits a rails-to-trails conversion but does not effect a permanent abandonment. 49 C.F.R. § 1152.29(c) and *Policy Statement on Rails to Trails Conversions,* Ex Parte No. 274, 1990 ICC WL 287255 at *3 (Jan. 29, 1990). Thus, to determine whether the railroad's conduct is abandonment or mere discontinuance, we must often look to additional behavior which signifies one or the other. *St. Louis S.W. R.R. Co.—Abandonment—in Smith and Cherokee Counties, Texas,* No. AB–39 (Sub–No. 12), 1992 ICC WL 457275 at *3–*4 (Mar. 23, 1992).[12]

Birt identifies two types of actions by UP which she claims demonstrate the requisite intent to abandon. First, UP discontinued rail service, canceled its tariffs, and salvaged the rails and ties on the contested property. Since, however, these actions are consistent with either abandonment or discontinuance, we must also consider whether UP has engaged in any other actions which shed additional light on its intent. Birt also points to two pieces of correspondence in which UP refers to the line as "abandoned." In a January 3, 1994 letter to the ICC, UP stated: "Pursuant to the Commission's Certificate and Decision served November 26, 1993, the portion of Union Pacific's Stoddard Branch between milepost 1.75 and milepost 17.65 was abandoned effective December 26, 1993." In another letter, this one written to Birt, UP stated on May 23, 1994, that it could not provide her with information on which rights-of-way would revert to adjoining landowners "because of a long standing Union Pacific policy of not making determinations regarding title to *abandoned* rights of way" (emphasis added).

We do not believe these letters adequately establish UP's intent to abandon the line, in light of the railroad's subsequent explanation of the two statements, and its firmly expressed desire to continue "rails-to-trails" negotiations throughout the nine-month period from January to September of 1994. In responding to Birt's initial opposition to the extension, UP addressed the first statement, explaining to the Commission that

Union Pacific's advice that the line had been "abandoned" was merely a statement to the effect that Union Pacific had discontinued its common carrier obligation to operate the line. As shown by its willingness to negotiate with the City of Nampa for conveyance of the right of way for a trail, Union Pacific did not intend that the Commission lose jurisdiction over the line and, in any event, that result would have been impossible because of the existence of the CITU. It is clear, of course, that salvaging of trackage does not result in a loss of Commission jurisdiction because the railroad's willingness to enter into trails act negotiations is inconsistent with an intent to consummate abandonment.

The Commission found this clarification credible, relying upon it in its February, 1995 ruling that UP had not abandoned the track. *1995 UP Abandonment Decision* at *4–*5. While, as Birt points out, UP has extensive experience in the railroad business, and its attorneys must be expected to know the difference between "abandonment" and "discontinuance" of a rail line—we do not think the Commission acted arbitrarily in determining that UP's continued willingness to negotiate was a stronger signal of its intent than the misuse of the term "abandoned" in this letter. As for the second "mistake," the Commission again determined that UP's use of the word "abandoned" should not be dispositive since it was used only incidentally in a letter answering Birt's queries about which

---

12. Various types of behavior might shed light on whether a railroad intends to abandon or just temporarily discontinue service. For example, if a line in bad repair due to the railroad's purposeful neglect is destroyed by bad weather, courts have inferred that the railroad meant to abandon it, even though terminations of service caused by factors beyond the railroad's control (such as unusual weather conditions) are generally not characterized as abandonment. *See, e.g., ICC v. Maine Cent. R.R. Co.,* 505 F.2d 590, 593–94 (2d Cir.1974); *ICC v. Chicago, Rock Island & Pacific R.R. Co.,* 501 F.2d 908, 911–12 (8th Cir.1974), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1393, 43 L.Ed.2d 652 (1975). Our court has also noted that the Commission has previously found an intent to abandon based on a railroad's failure to make any efforts to attract rail traffic on a line where service had been discontinued. *See Consolidated Rail Corp. v. ICC,* 29 F.3d 706, 713 (D.C.Cir.1994) (citing *Modern Handcraft, Inc.,* 363 I.C.C. 969, 971 (1981)).

parts of the rail line were reversionary interests, and focused not at all on whether this line had been abandoned. *Id.* at *5. Although UP's use of the term in both instances was undoubtedly sloppy, this explanation too seems reasonable. Actions do speak louder than words, and UP was all the while engaged in negotiating with Nampa on the trail conversion.

Prior to termination of the initial CITU, UP advised the Commission several times of its willingness to enter into a trails conversion: on August 20, 1993, when it first contacted the Commission about Nampa's request; on November 16, 1993, when it reiterated its interest in an agreement; and on June 13, 1994, when it joined Nampa in asking for a 60–day extension of the CITU. The Commission has previously found that a railroad's continued participation in rails-to-trails negotiations suggests that it does *not* intend to fully abandon the line, but rather to retain the right-of-way while permitting interim trail use. *Cf. St. Louis S.W. R.R. Co.—Abandonment—in Smith and Cherokee Counties, Texas,* No. AB–39 (Sub–No. 12), 1992 ICC WL 457275 at *4 (Mar. 23, 1992) (negotiations for sale of line indicate railroad did not intend to abandon line).[13] Certainly it was reasonable for the Commission to draw the same conclusion here, particularly when UP's final letter expressing its amenability to trail use comes more than six months after the most compelling piece of evidence Birt marshals in her favor—the January letter from UP to the ICC referring to the line as "abandoned" effective December 26, 1993. Since the CITU issued on December 21, 1993, prevented UP from abandoning before its expiration on June 21, 1994, Birt's position can only prevail if abandonment is a one-way street—if, once a railroad makes some indication that it intends to abandon, it cannot change course and opt for trails usage instead. To be sure, this may be the legal outcome if the railroad expresses a definite intent to abandon while in possession of an effective certificate of abandonment. But if the certificate has already been stayed by a CITU, as it was here, the railroad cannot be held fast to an isolated indication of intent to abandon rather than to negotiate with a potential trail sponsor, at least until the CITU expires. For one thing, such a result would risk holding parties to what may be a strategic bargaining position during a time explicitly reserved for negotiation, and so undermine the preference for trail use which Congress addressed in enacting § 1247(d).

Birt points to. *Fritsch v. ICC,* 59 F.3d 248 (D.C.Cir.1995), *cert. denied sub. nom. CSX Transp., Inc. v. Fritsch,* —— U.S. ——, 116 S.Ct. 1262, 134 L.Ed.2d 210 (1996), as requiring a different result. In *Fritsch,* this court reversed a decision by the ICC that it retained jurisdiction over a track owned by CSX while a "public use condition"[14] attached to the certificate of abandonment was still pending. Shortly after the Commission issued a certificate of abandonment to CSX,

---

**13.** We find distinguishable *Illinois Central Gulf Railroad Company,* a case in which the Commission rejected a railroad's claim that it intended to negotiate a trails conversion, rather than abandon the track. There, a railroad and a potential trail sponsor filed requests for a CITU on two stretches of track. The ICC had granted a certificate of abandonment two years before the CITU petition for the first track was filed, and four years prior to filing of the CITU request for the second track. *Illinois Cent. Gulf R.R. Co.—Abandonment—in DeWitt and Piatt Counties, Illinois,* No. AB–43 (Sub–No. 134), 1988 WL 235412 at *1–*2 (Dec. 19, 1988). The Commission found that at the time the abandonment applications were filed and granted, the railroad fully intended to abandon the tracks, rather than convert them to trail use; only subsequently did the railroad exhibit any intent to enter into a rails-to-trails agreement. *Id.* at *5–*6. Because abandonment—absent any indicia of an intent to negotiate with a potential trail sponsor—occurred after issuance of certificates of abandonment, but before filing of a CITU application, the Commission ruled that it had lost jurisdiction over the rights-of-way and could not grant a CITU. *Id.* Here, UP displayed an intent to negotiate trail use contemporaneous with actions that might otherwise indicate abandonment—not several years after those events occurred.

**14.** Section 10906 of the Railroad Revitalization and Reform Act imposes a 180–day waiting period on a railroad that wishes to sell, lease, exchange, or otherwise dispose of a line. During that time, the railroad must consider any competitive offers for purchase of the right-of-way by an entity that will use the track for a public use. 49 U.S.C. § 10906 (1994); *see also Fritsch,* 59 F.3d at 249, 252–53.

the railroad told the Commission it had abandoned the line and indicated that it would not negotiate a rails-to-trails conversion. *Fritsch*, 59 F.3d at 250. Six months later, CSX changed its mind and reached an agreement with the would-be trail sponsor. The Commission approved the deal pursuant to its authority under the Trails Act, ruling that it retained jurisdiction over the property because the 180–day "public use period" had not expired and until that time, CSX could not legally consummate abandonment. This court ruled, however, that while § 10906 stays a railroad's authority to sell, lease, exchange, or otherwise dispose of the right-of-way, it does not stay abandonment. *Id.* at 252. Concluding that the railroad had, in fact, abandoned the line before it agreed to trail usage, the court ruled that the Commission lacked jurisdiction to approve the once spurned, now favored trail use agreement. We agree that under *Fritsch* and other relevant precedent, abandonment terminates the Commission's authority over a rail line. In *Fritsch*, however, the court found the railroad's intent to abandon the line before it began negotiations with the trail sponsor "could not have been clearer." *Id.* at 253. That conclusion is what distinguishes *Fritsch* from Birt's situation—in *Fritsch*, the bell rang well before the railroad displayed any interest in trail usage. Although Birt has

identified several actions similar to the indicia of intent in *Fritsch* (removal of tracks, cessation of service, and correspondence with the Commission expressing an intent to abandon), the Commission marshaled countervailing evidence of contemporaneous and continued trail negotiations over a period of nine months which suggested that the railroad did not intend to abandon.[15] In short, while the analytic framework for resolving both cases is similar—did the railroad exhibit an intent to abandon at a time when it was authorized to do so by the Commission?—clear evidence of such intent is present in one case but not the other.

B. *ICC Had Authority to Issue Extensions of CITU While UP and Nampa Negotiated*

Birt claims the Commission lacked authority to issue three extensions of the UP/Nampa CITU—one on June 29, eight days after the original CITU expired; one on August 19; and the final one on September 26. Birt first argues that the Commission is not authorized to grant *any* extensions of a CITU because its own regulations prescribe a 180–day deadline for negotiations.[16] We disagree. Although the regulation indicates that the CITU shall run 180 days, it is silent as to whether extensions may be granted.[17]

**15.** In expressing concern about how "the Board or future petitioners will be able to determine whether *Fritsch* or this opinion governs similar disagreements," dissenting opinion at 1, the dissent implies that these two decisions set forth conflicting standards for consummation of abandonment. We think not. *Fritsch* holds that clear evidence of intent to abandon deprives the Commission of jurisdiction over a line and prohibits it from subsequently reasserting authority over the easement. We do not, however, read *Fritsch* as holding that abandonment is necessarily triggered upon a showing of any single piece of evidence indicative of an intent to abandon, when accompanied by conflicting contemporaneous evidence suggesting that the railroad intended to retain control over the line. Since such countervailing evidence may properly lead the Board to find that the railroad did not intend to abandon the line, the Board asked appropriate question in considering Birt's objections: not, as the dissent suggests, whether UP had engaged in several specific actions consistent with an intent to abandon, but whether UP's actions during this period, considered in their entirety, indicated an intent to abandon or an intent to maintain con-

trol. Although the actions to which both Birt and the dissent point might have been sufficient for consummation if the Board could not identify any conflicting evidence casting doubt on UP's intent to abandon, it has pointed to specific contemporaneous actions by UP which led it to conclude that the railroad intended to retain control over the line until a rails-to-trails conversion had been negotiated, rather than abandoning the line.

**16.** The "rails-to-trails" regulations provide in relevant part:

The Commission will ... issue an appropriate CITU or NITU that will permit the parties to negotiate for a period agreed to by the parties ..., *but not to exceed 180 days*, at the end of which, the CITU or NITU will convert into a certificate ... permitting abandonment.
49 C.F.R. § 1152(g) (emphasis added).

**17.** By contrast, Congress did impose a specific time limit of 180 days in § 10906 of the Railroad Revitalization and Regulatory Reform Act, which allows the Commission to issue a "public use

The Commission has interpreted this ambiguity in its rules as permitting extensions of a CITU. We give the Commission significant leeway in reviewing this interpretation; precedent firmly establishes that "courts owe 'even greater deference to agency interpretations of agency rules than ... to agency interpretations of ambiguous statutory terms.'" *Brotherhood of Railway Carmen v. Pena*, 64 F.3d 702, 705 (D.C.Cir.1995) (quoting *Consolidated Rail Corp. v. ICC*, 43 F.3d 1528, 1532 (D.C.Cir.1995) (quoting *Capital Network System, Inc. v. FCC*, 28 F.3d 201, 206 (D.C.Cir.1994))).

We find the Commission's construction of its trails regulations an acceptable one. First, its reading of the CITU regulation is consistent with past practice. *See, e.g., Missouri Pacific R.R. Co.—Abandonment Exemption—In Denton County, TX*, No. AB–3 (Sub–No. 99X), 1993 ICC WL 182674 (May 24, 1993); *Missouri Pacific R.R. Co.—Abandonment—In Okmulgee, Okfuskee, Hughes, Pontotoc, Coal, Johnston, Atoka, and Bryan Counties, OK*, No. AB–3(Sub–No. 63), 1989 ICC WL 247069 (Dec. 18, 1989); *Rail Abandonments—Use of Rights–of–Way as Trails—Supplemental Trails Act Procedures*, Ex Parte No. 274 (Sub–No. 13), 1987 ICC WL 97291 at *3 (Dec. 2, 1987) ("Examples of the types of decisions that could be made by the Director [of the rails-to-trails program] would include ... extending the period for reach a trail use agreement."). These decisions granting extensions—despite the language of § 1152.29—also square with a reluctance we have discussed elsewhere to construe regulatory deadlines as mandatory, rather than directory. *See Brotherhood of Railway Carmen*, 64 F.3d at 704–05.[18] Nor does the Commission's policy of granting extensions when presented with evidence of good-faith negotiations between the railroad and potential trail sponsor compromise the goal that a CITU is intended to advance— providing a defined window of opportunity for reaching agreement on a trails conversion. Although extensions *ad infinitum* might frustrate that purpose by allowing the railroad to stop service without either relinquishing its rights to the easement or putting the right-of-way to productive use, an extension of 30 or 60 days does not threaten such a result.

■ Deciding that the ICC could have granted a timely extension does not end the inquiry. We must also consider Birt's additional claim that the agency could not *retroactively* issue the first extension on June 29, 1994, eight days after the CITU expired. As we explained, an effective certificate of abandonment confers permissive authority on the railroad; until the railroad actually consummates abandonment, none occurs, and the Commission retains jurisdiction over the railroad's right-of-way. We see no reason then why, in the absence of any effective abandonment by UP during the eight-day period, the ICC could not exercise this ongoing authority to extend the CITU, even though the existing one had expired. Birt has identified no reason why retroactive extension in this case would be unfair, the objection most often raised to retroactive agency action. *See, e.g.,* KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 13.2 (1994). To the extent fairness concerns are implicated by this dispute, they probably weigh against Birt; denying the extension solely on grounds of retroactivity would force UP and Nampa—who filed their request for an extension four days prior to expiration of the CITU [19]—to bear the brunt of the agen-

condition" staying sale or lease of a railroad's right-of-way. This provision suggests that had Congress intended to preclude extension of a CITU, it would have included a similar time limit in § 1247(d) of the Trails Act.

**18.** In *Carmen*, the agency construed a regulation stating that "Each petition shall be decided not later than 4 months after its receipt" as permitting it to decide a petition 5 days after the 4 month deadline had expired. *Brotherhood of Railway Carmen*, 64 F.3d at 704. This court upheld the agency, holding that "absent a clear indication that Congress intended otherwise, we will deem a statutory deadline to be directory. We see no reason why we should not apply the same principle to a regulatory deadline. An agency, after all, is presumably no more inclined than Congress to place constraints on administrative action, especially when it is its own." *Id.*

**19.** At oral argument, counsel for appellant directed our attention to an ICC regulation requiring that requests for extensions be filed "not less than 10 days prior to the due date." *See* 49 C.F.R. § 1104.7(b). Appellant did not raise this

cy's tardy consideration. Although we are cognizant of the confusion caused by administrative agencies responding to extension requests after the initial deadline has passed, such situations do arise and the extension granted here did not operate unreasonably.

### III. CONCLUSION

We find neither of Birt's objections to the Commission's orders compelling, and conclude that the ICC's orders regarding the UP/Nampa CITU were not arbitrary and capricious. Although the petitioner identified several actions by UP which could be construed as evidence of an intent to abandon the Stoddard Branch, the Commission identified countervailing evidence which suggested that the railroad intended to negotiate a rails-to-trails agreement with the City of Nampa, not to fully abandon its right-of-way. Nor did the Commission act outside the bounds of its discretion in extending the duration of the UP/Nampa CITU in its orders of June 29, August 19, and September 20, 1994. Accordingly, the petition for review is

*Denied.*

SENTELLE, Circuit Judge, dissenting:

As the majority acknowledges *Fritsch v. ICC*, 59 F.3d 248 (D.C.Cir.1995), establishes the law on reopening abandoned rail trackage for rails-to-trail agreement. Under *Fritsch,* the ICC's "jurisdiction over a line terminates when the line is completely abandoned...." *Id.* at 253. In *Fritsch* we concluded that an abandonment had occurred where the railroad had expressed its intention to abandon; offered adequate support for, and received approval of, its abandonment certificate; and removed its equipment. As the majority acknowledges, in the present case UP had filed its request for an abandonment certificate, received approval and removed its equipment. It even sent correspondence to the petitioner in the present case referring to the rights of way as "abandoned." The majority in a heading states that "UP did not consummate abandonment," but points to nothing further that UP needed

to or indeed could have done to consummate its abandonment. This case is squarely governed by *Fritsch,* and I do not see how the Board or future petitioners will be able to determine whether *Fritsch* or this opinion governs similar disagreements.

I further do not understand the majority's reasoning in upholding the Board's retroactive extension. In *Fritsch* we held that once the abandonment had occurred, the Commission (now succeeded by the Board) had lost its jurisdiction to take action granting a rails-to-trail conversion. We expressly held that "the ICC was without power to undo the abandonment...." *Id.* I do not understand nor does the majority explain how a Board without jurisdiction, under the rubric of granting an extension not granted before the loss of jurisdiction, can reopen to create a jurisdiction it has lost. As we noted in *Fritsch,* the Supreme Court has held that "[o]nce a carrier 'abandons' a rail line pursuant to authority granted by the [Board], the line is no longer part of the national transportation system, and although the [Board] is empowered to impose conditions on abandonments, ... as a general proposition ... jurisdiction terminates." *Id.* (quoting *Preseault v. ICC,* 494 U.S. 1, 5–6 n. 3, 110 S.Ct. 914, 919 n. 3, 108 L.Ed.2d 1 (1990)).

In *Fritsch,* we held that because the Commission had not imposed any condition on the abandoning line, it retained no jurisdiction, and the attempt to change the mind of the railroad and the Commission on the question of abandonment was without effect. I do not see why the same is not true here.

In sum, this case is indistinguishable from *Fritsch,* and the result should be the same. I respectfully dissent.

---

point in her briefs to this court or before the agency, and so we will not consider it. *See Ohio v. EPA,* 997 F.2d 1520, 1528–29 (D.C.Cir.1993);

*Linemaster Switch Corp. v. EPA,* 938 F.2d 1299, 1308 (D.C.Cir.1991).